UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

MIGUEL FRANCISCO MORA NUNEZ, and CHRISTHIAN AYBAR-BERROA,

Defendants.

S1 25 Cr. 367 (LAP)

---

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SUPERSEDING
INDICTMENT**

JAY CLAYTON
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Mostafa Khairy
Special Assistant United States Attorney
    *-Of Counsel-*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 3

I.      Defendant Mora Nunez's Immigration History ................................................. 3

II.     Defendant Aybar-Berroa's Immigration History ............................................... 4

III.    The July 19 Shooting and Arrest of the Defendants ......................................... 5

ARGUMENT ........................................................................................................................ 8

I.      The Defendants Are Not Among "the People" Protected by the Second Amendment ...... 8

        A.      Precedent Demonstrates that the Second Amendment Right Belongs to Citizens . 8

        B.      The Historical Record Confirms that the Second Amendment Right Belongs to Citizens ................................................................................................... 14

II.     Section 922(g)(5)(A) is Consistent with This Nation's Tradition of Firearms Regulation 18

        A.      Nonmembers of the Political Community Have Historically Been Restricted from Bearing Arms. ......................................................................................... 19

        B.      Section 922(g)(5)(A) Is Analogous to Founding-Era Firearms Restrictions ........ 20

CONCLUSION ................................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*Cabell v. Chavez-Salido*,
    454 U.S. 432 (1982) ............................................................................... 10

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ........................... 1, 2, 8, 9, 10, 11, 12, 14, 15, 16, 18, 19, 22

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022) ........................................................................... 17

*Drummond v. Robinson Twp.*,
    9 F.4th 217 (3d Cir. 2021) ....................................................................... 22

*Hampton v. Mow Sun Wong*,
    426 U.S. 88 (1976) ................................................................................. 23

*Mathews v. Diaz*,
    426 U.S. 67 (1976) ................................................................................. 23

*McDonald v. City of Chi.*,
    561 U.S. 742 (2010) ..................................................................... 2, 8, 9, 16, 20

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) .......................................... 2, 3, 9, 12, 17, 18, 19, 20, 22

*Plyler v. Doe*,
    457 U.S. 202 (1982) .......................................................................... 12, 13, 14

*Shaughnessy v. United States ex rel. Mezei*,
    345 U.S. 206 (1953) ............................................................................... 23

*United States v. Carbajal-Flores*,
    143 F.4th 877 (7th Cir. 2025) .................................................................... 20

*United States v. Carpio-Leon*,
    701 F.3d 974 (4th Cir. 2012) ......................................................... 11, 15, 21, 23

*United States v. Flores*,
    663 F.3d 1022 (8th Cir. 2011) .................................................................... 17

*United States v. Huitron-Guizar*,
    678 F.3d 1164 (10th Cir. 2012) ............................................................... 11, 22

*United States v. Jimenez*,
    895 F.3d 228 (2d Cir. 2018) ...................................................................... 10

*United States v. Jimenez-Shilon*,
    34 F.4th 1042 (11th Cir. 2022) ........................................................ 11, 14, 16, 19

*United States v. Meza-Rodriguez*,
    798 F.3d 664 (7th Cir. 2015) .................................................................. 11, 21

*United States v. Murillo-Lopez*,
    151 F.4th 584 (4th Cir. 2025) .................................................................... 17

*United States v. Muñoz-De La. O*,
    2022 WL 508892 (E.D. Wash. Feb. 18, 2022) ........................................... 21

*United States v. Perez*,
    6 F.4th 448 (2d Cir. 2021) ...................... 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 21

*United States v. Portillo-Munoz*,
    643 F.3d 437 (5th Cir. 2011) .................................................... 10, 11, 13, 17

*United States v. Rahimi*,
    602 U.S. 680 (2024) .................................................................................. 18

*United States v. Singh*,
    979 F.3d 697 (9th Cir. 2020) ................................................................... 11

*United States v. Sitladeen*,
    64 F.4th 978 (8th Cir. 2023) ................................................................... 18

*United States v. Torres*,
    911 F.3d 1253 (9th Cir. 2019) ................................................................. 10

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) ..................................................... 10, 11, 12, 13, 14

**Statues**

8 U.S.C. § 13 ............................................................................................. 5, 6

8 U.S.C. § 212 ............................................................................................ 4, 5

8 U.S.C. § 1229 ........................................................................................... 4

18 U.S.C. § 3 .............................................................................................. 1

18 U.S.C. § 611 ........................................................................................... 12

18 U.S.C. § 922 ..................................................... 1, 2, 3, 13, 17, 18, 19, 22

U.S. Const. amend. II .................................................................................. 1, 2

U.S. Const. amend. IV ................................................................................. 12

U.S. Const. art. I, § 2, cl. 1 ......................................................................... 12

**Other**

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*,
    73 Fordham L. Rev. 487, 506 (2004) ....................................................... 15

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*,
    25 Law & Hist. Rev. 139, 157 (2007) ...................................................... 15

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendants Miguel Francisco Mora Nunez and Christhian Aybar-Berroa's motions to dismiss the superseding indictment ("Defs. Mots."), [1] which charges Mora Nunez with one count of possession of ammunition by an illegal alien, in violation of 18 U.S.C. § 922(g)(5), and charges Aybar-Berroa with one count of accessory after the fact to possession of ammunition by an illegal alien, in violation of 18 U.S.C. § 3, and one count of possession of ammunition by an illegal alien, in violation of 18 U.S.C. § 922(g)(5). *See* Dkts. 1, 6, 20 (the "Superseding Indictment"). For the reasons set forth herein, the Court should deny the defendants' motions to dismiss the Superseding Indictment.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment guarantees the right of "law-abiding, responsible citizens" to possess arms for self-defense. *Id.* at 635. The Court cautioned, however, that the right to keep and bear arms "is not unlimited" and that the right remains subject to "lawful regulatory measures." *Id.* at 626, 627 n.26. 18 U.S.C. § 922(g)(5)(A) constitutes one such lawful regulatory measure.

---

[1] On December 12, 2025, defendant Aybar-Berroa submitted a legal brief in support of his motion to dismiss the superseding indictment on Second Amendment grounds. Dkt. 25. On December 13, 2025, defendant Mora Nunez submitted a letter motion moving to dismiss the Superseding Indictment against him stating, "the legal issues and arguments concerning [Section 922(g)(5)'s] constitutionality are identical for both defendants" and, as such, Mora Nunez "explicitly relies on all of the facts and legal arguments set out in [defendant Aybar-Berroa's] memorandum of law in support of his motion to dismiss the indictment, and [Mora Nunez] adopts them as his own." Dkt. 26 at 1. Defendant Mora Nunez did not submit a legal brief in support of his own motion. Accordingly, the Government addresses both defendants' motions in this opposition.

Pursuant to Section 922(g)(5)(A), "[i]t shall be unlawful for any person . . . who, being an alien . . . is illegally or unlawfully in the United States" to ship, transport, possess, or receive any firearm or ammunition in or affecting interstate or foreign commerce. Defendants concede, for the purposes of their motions, that they are both unlawfully present in the United States, however, they argue that, in the wake of *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 142 S. Ct. 2111 (2022), Section 922(g)(5)(A) is unconstitutional. *See* Defs. Mots. at 6, n.2. This argument fails for two reasons.

First, the defendants, as undocumented immigrants who have both been ordered removed from the United States by an immigration judge, are not part of "the people" to whom the Second Amendment applies. The Second Amendment provides only for "the right of *the people* to keep and bear Arms." U.S. Const. amend. II (emphasis added). The Supreme Court, including in *Bruen*, has repeatedly framed the scope of this right as protecting the rights of "citizens" who are "law-abiding"; the defendants are neither. *See, e.g.*, *Heller*, 554 U.S. at 635 (holding that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home"); *McDonald v. City of Chicago*, 561 U.S. 742, 768 (2010) (describing *Heller* as holding that "citizens must be permitted 'to use [handguns] for the core lawful purpose of self-defense'" (quoting *Heller*, 554 U.S. at 630) (alteration in *McDonald*)); *Bruen*, 142 S. Ct. at 2156 (characterizing the right as belonging to "law-abiding citizens"). The historical understanding of the Second Amendment, which did not extend the right to bear arms to those outside of the political community, is consistent with this understanding of "the people" as limited to citizens. The scope of the Second Amendment's text is thus itself sufficient to deny the defendants' motion to dismiss.

Second, to the extent the Court goes on to analyze whether the Second Amendment permits the restriction in Section 922(g)(5)(A), that restriction is consistent with and similar to relevant

historical practice around firearms regulation. Nonmembers of the political community have historically been denied the right to firearms possession by colonial and Founding-era legislatures, making Section 922(g)(5)(A)'s restriction consistent with historical firearms restrictions. And while laws explicitly barring undocumented immigrants from firearm possession are of more recent vintage, that is because illegal immigration is itself a new problem. The Court should therefore follow *Bruen*'s instruction by looking to analogous—and not strictly identical—historical restrictions upon those deemed nonmembers of the political community and conclude that Section 922(g)(5)(A) is consistent with such restrictions.

In short, nothing in the Supreme Court's recent Second Amendment cases, all of which concerned restrictions on the ability of law-abiding citizens to keep and bear arms, should cause this Court to reconsider the unanimous consensus of appellate courts upholding the constitutionality of Section 922(g)(5)(A)'s restriction on undocumented immigrants' firearm and ammunition possession.

## **BACKGROUND**

### I. **Defendant Mora Nunez's Immigration History**

As set forth in the Complaint in this case, defendant Mora Nunez is a native and citizen of the Dominican Republic, and he is not, nor has he ever been, a citizen of the United States. *See* Complaint at Dkt. 1 ("Compl.") ¶ 11(a). On or about April 1, 2023, Mora Nunez entered the United States from Mexico unlawfully through the San Luis, Arizona, border. *Id.* at ¶ 11(b). Mora Nunez was immediately apprehended by Customs and Border Patrol ("CBP") officers for unlawfully entering the United States and temporarily detained by the CBP officers. *Id.* at ¶ 11(c). On April

2, 2023, Mora Nunez was served in person with a Notice to Appear ("NTA"),[2] which charged him as removable from the United States under INA § 212(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General. *Id.* at ¶ 11(d). Following his release from CBP custody, on or about July 16, 2023, DHS issued a Superseding NTA, by mail, to Mora Nunez, which charged him as removable from the United States under INA § 212(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General. *Id.* at ¶ 11(e). The Superseding NTA directed Mora Nunez to appear at the New York Broadway Immigration Court on February 21, 2024. *Id.* at ¶ 11(f). Mora Nunez failed to appear on that date as ordered. *Id.* On or about November 6, 2024, an immigration judge ordered Mora Nunez removed, *in absentia*, for failing to appear at his removal proceedings as ordered. Mora Nunez has remained in the United States unlawfully, and without status, since the removal order was entered on November 6, 2024.

## II.  Defendant Aybar-Berroa's Immigration History

Defendant Aybar-Berroa is a native and citizen of the Dominican Republic, and he is not, nor has he ever been, a citizen of the United States. Compl. ¶ 13(a). On or about June 19, 2022, Aybar-Berroa entered the United States from Mexico unlawfully by crossing the Rio Grande River near Eagle Pass, Texas. *Id.* at ¶ 13(b). Aybar-Berroa was apprehended by CBP officers for unlawfully entering the United States and temporarily detained. *Id.* at ¶ 13(c). On July 22, 2022, Aybar-Berroa was served in person with a NTA which charged him as removable from the United States under INA § 212(a)(6)(A)(i), as an alien present in the United States without being admitted

---

[2] An NTA is a formal charging document issued by the Department of Homeland Security ("DHS") that initiates removal proceedings. *See* 8 U.S.C. § 1229(a)(1).

or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General. *Id.* at ¶ 13(d). The NTA served on Aybar-Berroa contained an appearance date of August 19, 2022, directing Aybar-Berroa to appear at the San Antonio Immigration Court. *Id.* This immigration court appearance was later rescheduled to January 3, 2023. *Id.* On January 3, 2023, an immigration judge ordered Aybar-Berroa removed, in absentia, for failing to appear for his removal proceedings. *Id.* at 13(e). Aybar-Berroa has remained in the United States unlawfully, and without status, since the removal order was entered on January 3, 2023.

### III. The July 19 Shooting and Arrest of the Defendants

On July 19, 2025, defendants Mora Nunez and Aybar-Berroa set out to indiscriminately rob unsuspecting New Yorkers in Fort Washington Park in Manhattan, New York. Mora Nunez, armed with a gun, rode on the back of a motorbike driven by Aybar-Berroa. Compl. ¶ 6(a). At approximately 11:45 p.m., the defendants drove up to a female individual (the "Female Victim") as she sat on a park bench and robbed the Female Victim of her cellphone. *Id.* at ¶ 6(b). During the robbery of the Female Victim, Mora Nunez and the Female Victim struggled over the Female Victim's phone, but the Female Victim ultimately let go of her cellphone when she observed a bulge at the front of Mora Nunez's waistband, which the Female Victim believed to be either a gun or a knife. *Id.* The defendants fled on the motorbike driven by Aybar-Berroa. *Id.*

Approximately a few minutes after the robbery of the Female Victim, approximately 100 yards away, while still inside of Fort Washington Park, Mora Nunez and Aybar-Berroa identified their next robbery targets, a male ("Victim-1") and female ("Victim-2") (collectively "the Victims") who were sitting on rocks alongside the Hudson River. Compl. ¶¶ 6(c)-6(e); *see* Compl.

**Image-1** and **Image-2**.[3] After seeing the Victims sitting by the rocks, Mora Nunez got off the motorbike and approached the Victims while Aybar-Berroa turned the motorbike around toward the direction from which the defendants had approached from, in preparation to flee. Compl. ¶¶ 6(d)-6(e). Mora Nunez approached the Victims while brandishing a gun. *Id.* at ¶ 6(f). Mora Nunez fired his gun approximately twice, with at least one bullet striking Victim-1 in the right arm and in the face. *Id.* at ¶ 6(g). Victim-1, who is a CBP Officer, and was off-duty at the time of the shooting but carrying his CBP issued 9mm pistol, and despite being shot in the arm and face by Mora Nunez, was able to return fire and struck Mora Nunez twice. *Id.* at ¶ 6(g). After being shot, Mora Nunez ran back towards the motorbike, where Aybar-Berroa was standing ready to flee the scene, got on the motorbike, and the defendants sped away. *Id.* at ¶ 6(h). Following the shooting, law enforcement officers recovered at the scene one live .380 caliber Sig Sauer cartridge and one spent .380 PMC casing, which were fired from Mora Nunez's gun. *Id.* at ¶¶ 6(g)-7.

On or about July 20, 2025, at approximately 12:04 a.m., *i.e.*, less than approximately 20 minutes after the shooting, Mora Nunez was dropped off at a hospital located approximately 2.1 miles away from the scene of the shooting by Aybar-Berroa. Compl. ¶ 9(a); *see* Compl. **Image-4** and **Image-5**. Aybar-Berroa dropped Mora Nunez in the emergency room ambulance loading bay, left him on the floor, and sped away from the hospital. Compl. ¶¶ 9(b)-9(c). New York City Police Department ("NYPD") staff at the hospital thereafter identified Mora Nunez as the suspected shooter of Victim-1. *Id.* at ¶¶ 10(a)-10(e).

While Aybar-Berroa was on the run from law enforcement officers, on or about July 20, 2025, Aybar-Berroa was able to get in touch with a relative of Mora Nunez ("Relative-1"). Compl.

---

[3] Mora Nunez is wearing the white shirt, riding on the back of the motorbike and Aybar-Berroa is wearing the red shirt and driving the motorbike.

¶¶ 12(a)-12(b). At some point on July 20, 2025, Aybar-Berroa and Relative-1 met in person, wherein Aybar-Berroa provided Relative-1 with the clothes he was wearing during the shooting so that Relative-1 could get rid of the clothes. *Id.* at ¶ 12(c). On or about July 21, 2025, at approximately 3:00 a.m., Aybar-Berroa was apprehended by law enforcement officers in Queens, New York. *Id.* at ¶¶ 13(f)-13(g).

On or about July 22, 2025, pursuant to judicially authorized search warrants, law enforcement officers searched both defendants' cellphones. Contained on defendant Mora Nunez's cellphone was a picture, dated July 15, 2025, *i.e.*, approximately four days before the shooting, of Mora Nunez and Aybar-Berroa posing together with firearms in their hands. Additionally, contained on defendant Aybar-Berroa's cellphone was a picture, dated approximately July 14, 2025, *i.e.*, approximately five days before the shooting, of Aybar-Berroa posing with a firearm in his hand.

On or about August 12, 2025, the NYPD received a call from the Fortune Society Freedom House (the "Fortune Society" or "Shelter"), a transitional housing unit for adult men, informing law enforcement officers that Shelter staff were clearing out defendant Aybar-Berroa's belongings from his bedroom and found a firearm and ammunition in his bedroom locker.[4] Pursuant to a state court issued search warrant, NYPD detectives searched Aybar-Berroa's shelter bedroom. In Aybar-Berroa's bedroom, the detectives recovered an imitation gun, a box of .380 caliber Sig Sauer ammunition containing six live cartridges, and two loose .380 caliber Sig Sauer cartridges. The .380 caliber Sig Sauer ammunition recovered from Aybar-Berroa's bedroom is the same ammunition used by defendant Mora Nunez in the July 19, 2025 shooting of Victim-1. *See* Compl.

---

[4] Defendant Aybar-Berroa had been in federal custody since his July 21, 2025 arrest by law enforcement officers.

¶¶ 6(g)-7. Moreover, after subsequent forensic testing, Mora Nunez's fingerprint was found on the .380 caliber Sig Sauer ammunition tray, which was located inside of the Sig Sauer ammunition box, found inside of Aybar-Berroa's bedroom closet. Additionally, NYPD obtained surveillance footage from the Shelter, dated July 20, 2025, at approximately 1:51 a.m., *i.e.*, approximately two hours *after* the shooting of Victim-1, depicting Aybar-Berroa entering the Shelter wearing the same Colorado Rockies baseball hat he was wearing during the shooting of Victim-1.

## ARGUMENT

### I.  The Defendants Are Not Among "the People" Protected by the Second Amendment

#### A.  Precedent Demonstrates that the Second Amendment Right Belongs to Citizens

In *Heller*, the Supreme Court determined that "the Second Amendment right is exercised individually and belongs to all *Americans*." 554 U.S. at 581 (emphasis added). The rest of the Court's opinion likewise reflects the understanding that the right to keep and bear arms belongs to "citizens" who are "law-abiding." *See id.* at 595 ("right of citizens"); *id.* at 603 ("an individual citizen's right"); *id.* at 608 (right "enjoyed by the citizen" (citation omitted)); *id.* at 613 ("citizens ha[ve] a right to carry arms"); *id.* at 625 ("weapons not typically possessed by law-abiding citizens"); *ibid.* ("possession of firearms by law-abiding citizens"); *id.* at 635 ("law-abiding, responsible citizens").

Subsequent Supreme Court cases have similarly identified the right as belonging to law-abiding citizens. *See, e.g.*, *McDonald*, 561 U.S. at 767-68 ("Thus, we concluded, citizens must be permitted 'to use [handguns] for the core purpose of lawful self-defense.'" (quoting *Heller*, 554 U.S. at 630) (alteration in *McDonald*)); *id.* at 775 ("one of the 'core purposes of the Civil Rights Act of 1866 and of the Fourteenth Amendment was to redress the grievances' of freedmen who had been stripped of their arms and to 'affirm the full and equal right of every citizen to self-defense'" (quoting A. Amar, The Bill of Rights: Creation and Reconstruction 187, 264-65

(1998))); *Bruen*, 142 S. Ct. at 2122 ("In [*Heller*] and [*McDonald*] we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."); *id.* ("ordinary, law-abiding citizens"); *id.* at 2133 (framing appropriate historical analogies as comparing "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *id.* at 2134 ("It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects."); *id.* at 2150 ("law-abiding citizens"); *id.* at 2156 ("law-abiding citizens"). Of course, undocumented immigrants are not citizens; in addition, they have, by definition, "show[n] a willingness to defy our law" by entering or remaining in the United States illegally, , and thus are not law-abiding citizens protected by the Second Amendment. *United States v. Perez*, 6 F.4th 448, 456 (2d Cir. 2021) (rejecting Second Amendment challenge to Section 922(g)(5)(A)), *cert. denied*, 142 S. Ct. 1133 (2022).[5]

The defendants attempt to avoid the Supreme Court's repeated emphasis that the Second Amendment right belongs to *law-abiding citizens*—a category from which he is doubly excluded—by pointing to the following passage of *Heller*:

> "The people" seems to have been a term of art employed in select parts of the Constitution . . . . Its uses suggest that "the people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

---

[5] Significantly, the Supreme Court denied Perez's petition for certiorari, even though he expressly asked the Court to hold his petition pending the decision in *Bruen*. Thus, the Court declined the opportunity to vacate and remand for further consideration in light of *Bruen*.

*Heller*, 554 U.S. at 580 (*United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)) (cleaned up). But this passage cannot bear the weight the defendants place on it. In the sentence immediately preceding the quoted language, the Supreme Court explained that "the term ['the people'] unambiguously refers to all members of the *political community*." *Heller*, 554 U.S. at 580 (emphasis added). The defendants acknowledge this critical context (Defs. Mots. at 6, 16), but not the difficulty it poses for their argument. The "political community," through its elected representatives, has excluded undocumented immigrants like the defendants from its membership:

> That illegal aliens remain outside the political community is reflected throughout the Constitution and federal law. Illegal aliens may not hold federal elective office, U.S. Const. art. I, § 2, cl. 2; *id.* art. I § 3, cl. 3; *id.* art. II, § 1, cl. 5, are barred from voting in federal elections, 18 U.S.C. § 611(a), may not serve on federal juries, 28 U.S.C. § 1865(b)(1), and are subject to removal from the United States at any time, 8 U.S.C. § 1227(a).

*Perez*, 6 F.4th at 463 (Menashi, J., concurring in the judgment); *see also Cabell v. Chavez-Salido*, 454 U.S. 432, 438-40 (1982) (observing that "citizenship . . . determin[es] membership in the political community" and that "[a]liens are by definition . . . outside of this community"). Thus, "[i]llegal aliens are not 'law-abiding, responsible citizens' or . . . 'members of the political community'—that is, 'the people'—who may invoke the Second Amendment." *Perez*, 6 F.4th at 463 (Menashi, J., concurring in the judgment) (quoting *United States v. Portillo-Munoz*, 643 F.3d 437, 440 (5th Cir. 2011), and *Heller*, 554 U.S. at 580).

The Second Circuit has not yet definitively resolved this question. *See Perez*, 6 F.4th at 453 (declining to decide whether undocumented immigrants have a constitutional right to bear arms, and upholding Section 922(g)(5)(A) on other grounds);[6] *see also United States v. Torres*,

---

[6] To be sure, the Second Circuit subsequently read the *Heller* passage discussed above to mean that "presumably at least some non-citizens are covered by the Second Amendment." *United States v. Jimenez*, 895 F.3d 228, 233 n.1 (2d Cir. 2018). But as Judge Menashi has noted, this language from *Jimenez* is quintessential *dicta*: "[*Jimenez*] had nothing to do with the application of the

911 F.3d 1253, 1258-61 (9th Cir. 2019) (similar); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1167-70 (10th Cir. 2012) (similar). But a clear majority of Courts of Appeals to answer the question have determined that undocumented immigrants are not among "the people" or "political community" to whom the Second Amendment applies, or otherwise are not protected by the Second Amendment. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1043-47 (11th Cir. 2022) (concluding, based on Second Amendment's "text and history," that illegal aliens "do not enjoy the right to keep and bear arms"); *United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) (discussing *Heller*, *Verdugo-Urquidez*, and the historical record at length and concluding "that illegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection"); *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (holding that "the protections of the Second Amendment do not extend to aliens illegally present in this country"); *Portillo-Munoz*, 643 F.3d at 442 ("Whatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States."); *see also United States v. Singh*, 979 F.3d 697, 724 (9th Cir. 2020) (rejecting challenge to Section 922(g)(5)(B) and noting that "those unlawfully present . . . are neither citizens nor members of the political community"), cert denied, 141 S. Ct. 2671 (2021); *but see United States v. Meza-Rodriguez*, 798 F.3d 664, 669-72 (7th Cir. 2015) (concluding that the defendant was among "the people" but upholding § 922(g)(5)(A) other grounds). And Judge Menashi, concurring in *Perez*, "would join those circuits that have held that illegal aliens are not among 'the people' to whom the right to keep and bear arms under the Second Amendment belongs." 6 F.4th at 461 (Menashi, J., concurring in the judgment).

---

Second Amendment to non-citizens, and the opinion contains no holding addressing that issue." *Perez*, 6 F.4th at 462 n.3 (Menashi, J., concurring in the judgment). And the Second Circuit declined to reach the question in *Perez*.

*Bruen* did nothing to cast doubt upon the decisions that have held that the Second Amendment does not extend to undocumented immigrants. *Bruen* noted that the Courts of Appeals had, since *Heller*, coalesced around a two-step framework for evaluating Second Amendment claims:

> At the first step, the government may justify its regulation by establishing that the challenged law regulates activity falling outside the scope of the right as originally understood. The Courts of Appeals then ascertain the original scope of the right based on its historical meaning. If the government can prove that the regulated conduct falls beyond the Amendment's original scope, then the analysis can stop there; the regulated activity is categorically unprotected. But if the historical evidence at this step is inconclusive or suggests that the regulated activity is not categorically unprotected, the courts generally proceed to step two [the application of means-end scrutiny].

*Id.* at 2126 (cleaned up).

Although the Supreme Court struck down the application of means-end scrutiny, it blessed the first step in this inquiry as "broadly consistent with *Heller*." *Id.* at 2127. Accordingly, the Court can look to the holdings of the Fourth, Fifth, Eighth, and Eleventh Circuits,[7] as well as Judge Menashi's *Perez* concurrence, to conclude that the defendants' challenge necessarily fails because undocumented immigrants are not among "the people" protected by the Second Amendment.

The defendants argue that the term "the people" in the Second Amendment must be consistent with its use elsewhere in the Bill of Rights, relying on *Verdugo-Urquidez* and *Plyler v. Doe*, 457 U.S. 202 (1982). *See* Defs. Mots. at 7-8. Their reliance on those decisions is misplaced.

---

[7] *Bruen*'s discussion of circuit courts' distinction between those regulations that burden "core" versus non-core Second Amendment rights came in the context of its rejection of means-end scrutiny. *See* 142 S. Ct. at 2126-27 (describing approach of circuits that apply strict scrutiny to burdens on core rights and intermediate scrutiny to burdens on non-core rights at the *second* step of the inquiry). *Bruen* did nothing to cast doubt on courts that analyzed the Second Amendment's historical meaning to determine whether "the regulated conduct falls beyond the Amendment's original scope," *id.* at 2126.

In *Verdugo-Urquidez*, the Supreme Court held that the Fourth Amendment—which protects "[t]he right of the people" against unreasonable search and seizure, U.S. Const. amend. IV—does not apply to "the search and seizure by United States agents of property that is owned by a nonresident alien and located in a foreign country." 494 U.S. at 261. The Court expressly declined to decide whether "the Fourth Amendment applie[s] to illegal aliens in the United States." *Id.* at 272. Even assuming that the term "the people" bears the same meaning in the Second and Fourth Amendments, then, *Verdugo-Urquidez* would not establish that the term encompasses noncitizens who are unlawfully present in the United States. While the Second Circuit has recognized undocumented immigrants' First and Fourth Amendment rights in some circumstances, the conclusion that the Second Amendment does not apply to noncitizens who are present in the country unlawfully rests not simply on the Second Amendment's reference to "the people,"[8] but also on the historical understanding of the scope of the right the Second Amendment codified. *See infra* at Section I.B; *Portillo-Munoz*, 643 F.3d at 440-41 (recognizing that "[t]he purposes of the Second and the Fourth Amendment are different" and thus "the use of 'the people' in both amendments need not "cover exactly the same groups of people").

In *Plyler*, meanwhile, the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment—which provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws"—protects noncitizens who are present in the United States illegally. 457 U.S. at 214-16. But that decision involved the meaning of the term "any

---

[8] Moreover, the argument that "the people" must be used consistently throughout the Founding Era constitutional text proves too much, as noncitizens are not among "the people" who may vote in congressional elections. *See* U.S. Const. Art. I § 2 cl. 1 ("The House of Representatives shall be composed of Members chosen every second Year by *the People* of the several States . . . ." (emphasis added)); 18 U.S.C. § 611.

person" in the Fourteenth Amendment, not the meaning of the distinct term "the people" in the

Second Amendment, or the distinct history of the right to keep and bear arms. *Id.* at 214; *see also*

*Jimenez-Shilon*, 34 F.4th at 1045 (distinguishing *Plyler* on this basis).

      *Verdugo-Urquidez* and *Plyler* thus do not suggest that noncitizens who are unlawfully

present in the United States are protected by the Second Amendment. And as discussed *infra*, even

if they were, Section 922(g)(5)(A) would be permissible regulation of the right to keep and bear

arms.

**B. The Historical Record Confirms that the Second Amendment Right Belongs to Citizens**

      The historical record supports the conclusion that the Second Amendment was understood

to extend the right to bear arms to *citizens* at the time of its ratification.  Under the English Bill of

Rights, which "has long been understood to be the predecessor to our Second Amendment," the

right to keep and bear arms was expressly limited to "Subjects."  *Heller*, 554 U.S. at 593 (quoting

Bill of Rights 1689, 1 W. & M., ch. 2, § 7, Eng. Stat. at Large 441); *see id.* ("By the time of the

founding, the right to keep and bear arms had become fundamental for English *subjects*."

(emphasis added)). And in colonial America,

> the right to keep and bear arms "did not extend to all New World
> residents." Joyce Lee Malcolm, To Keep and Bear Arms: The
> Origins of an Anglo-American Right 140 (1996). While "[a]lien
> men . . . could speak, print, worship, enter into contracts, hold
> personal property in their own name, sue and be sued, and exercise
> sundry other civil rights," they "typically could not vote, hold public
> office, or serve on juries" and did not have "the right to bear arms"
> because these "were rights of members of the polity." Akhil Reed
> Amar, The Bill of Rights: Creation and Reconstruction 48 (1998).

*Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (footnotes omitted); *accord*

*Jimenez-Shilon*, 34 F.4th at 1047-48.

Accordingly, colonial-era statutes did not extend the right to bear arms to those who were, at the time, not considered part of the political community. Massachusetts and Virginia forbade the arming of Native Americans, *see* Malcolm, *supra*, at 140, and Virginia also prohibited Catholics from owning arms unless they swore "allegiance to the Hanoverian dynasty and to the Protestant succession," Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007). The right to bear arms under the English Bill of Rights was similarly "restricted to Protestants" who were "Subjects." *Heller*, 554 U.S. at 593 (quoting Bill of Rights 1689, ch. 2, § 7); *see also Carpio-Leon*, 701 F.3d at 980 ("In England, the right to bear arms allowed the government to disarm those it considered disloyal or dangerous.").

Similarly, during the American Revolution, colonial governments disarmed persons who refused to "swear an oath of allegiance to the state or the United States." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004); *see id.* at 506 nn.128-129 (collecting statutes); *see generally* Churchill, *supra* at 159 ("[T]he new state governments ... framed their police power to disarm around a test of allegiance."). And during the ratification debates, the New Hampshire ratification convention proposed an amendment stating that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion," while delegates urged the Massachusetts convention to propose a similar amendment guaranteeing "peaceable citizens" the right to keep arms.  2 Bernard Schwartz, The Bill of Rights: A Documentary History 681, 761 (1971); *see Heller*, 554 U.S. at 604 (considering ratification conventions' proposals).  Accordingly, "State constitutions in the early republic continued a similar practice by restricting the right to keep and bear arms to citizens."  *Perez*, 6 F.4th at 463 & n.6 (Menashi, J., concurring in the judgment) (collecting

Alabama, Connecticut, Kentucky, Maine, Mississippi, and Pennsylvania constitutions); *accord Jimenez-Shilon*, 34 F.4th at 1049.

The Bill of Rights codified this understanding of the right to bear arms as being connected with membership in and preservation of the political community. *See McDonald*, 561 U.S. at 769-70 ("The right of *the citizens* to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist triumph over them." (quoting 3 J. Story, 3038 Commentaries on the Constitution of the United States § 1890, p. 746 (1833)) (emphasis added)).

Set against this extensive historical record showing that the right to bear arms was understood to attach only to citizens, defendants cite a state law that provided that certain "free white aliens" were eligible for militia duty and three state laws that, he asserts, effectively did the same thing by not expressly exempting them from militia service. Defs. Mots. at 14. As an initial matter, it is hardly surprising that a state law would not explicitly exclude noncitizens from militia duty, given that "the conception of the militia at the time of the Second Amendment's ratification was the body of all *citizens* capable of military service." *Heller*, 554 U.S. at 628 (emphasis added). Yet even if one accepts the defendants' premise that a handful of states included noncitizens within the obligation of militia service, and that by doing so those states did not prohibit them from bearing arms, the fact remains that other states excluded noncitizens from the right to bear arms. *See Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment) (explaining that "alien men . . . typically could not vote, hold public office, or serve on juries and did not have the right to bear arms because these were rights of members of the polity" and that "non-citizens . . . were neither expected, nor usually allowed, to participate in the militia" (quotation marks omitted)); *Jimenez-*

*Shilon*, 34 F.4th at 1047-48 (describing history of "disarmament of groups associated with foreign elements," including "on the ground of alienage" (quotation marks omitted)). And there is no suggestion that any states were viewed at the time as lacking the authority to exclude noncitizens from the right to bear arms. *See Bruen*, 142 S. Ct. at 2133 (where there were "no disputes regarding the lawfulness of [certain] prohibitions," one "can assume it settled" that those prohibitions are "consistent with the Second Amendment"); *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022) (noting that the fact that several states did not prohibit a given practice "does not mean that anyone thought the States lacked the authority to do so").

Moreover, the absence of laws explicitly excluding a group of noncitizens from a right that noncitizens already were understood not to possess is hardly surprising. *See Perez*, 6 F.4th at 462 n.4 (Menashi, J., concurring in the judgment) ("[A]rms bearing and suffrage were intimately linked two hundred years ago and have remained so."). Furthermore, as discussed *infra*, while immigration is hardly a new phenomenon, *illegal* immigration is essentially a phenomenon that began in the late 19th century; accordingly, the laws prohibiting illegal immigrants from bearing arms that followed close on the heels of the *existence* of illegal immigrants suggests that the Second Amendment does not extend to such persons. *See United States v. Sitladeen*, 64 F.4th 978, 987 (8th Cir. 2023) (holding challenge foreclosed by *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) which adopted *Portillo-Munoz*, 643 F.3d at 442)); *see also United States v. Murillo-Lopez*, 151 F.4th 584, 591 (4th Cir. 2025) ("This Court has already rejected a Second Amendment challenge to 18 U.S.C. § 922(g)(5), concluding undocumented non-citizens 'do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection.'").

Section 922(g)(5)(A) disarms noncitizens who are unlawfully present in the United States. Such persons, by definition, are not "law-abiding, responsible citizens" protected by the Second Amendment.[9] *Heller*, 554 U.S. at 635.  Accordingly, even assuming *arguendo* the defendants have substantial connections with the United States—which they do not—they cannot invoke the protections of the Second Amendment and the Court should deny their motions to dismiss the Superseding Indictment.

## II.    Section 922(g)(5)(A) is Consistent with This Nation's Tradition of Firearms Regulation

Assuming the Second Amendment applies at all, it permits limitations on the right to keep and bear arms that are "fairly supported by . . . historical tradition." *Heller*, 554 U.S. at 627; *see, e.g.*, *id.* at 626-27 & n.26 (emphasizing that "nothing in [the Court's] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," and stating that these "presumptively lawful regulatory measures" were identified "only as examples" and not as an "exhaustive" list). The Supreme Court confirmed in *Bruen* that, even where the Second Amendment applies, the government may justify a challenged restriction by showing "that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127; *See also United States v. Rahimi*, 602 U.S. 680, 692 (2024). The Court has affirmed not only that firearms regulations that are direct progeny of those at the relevant historical period are permissible, but also that courts may "determine[e] whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" by determining "whether the two regulations are relevantly similar." *Bruen*, 142 S. Ct. at 2132 (internal quotation marks omitted); *see also Rahimi*, 602 U.S. at 681. In conducting that

---

[9] It is further worth noting that, unlike in *Perez*, the defendants make no argument that they were using the gun in lawful self-defense or for any other purpose recognized under the Second Amendment.

inquiry, courts should examine "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133.[10]

### A. Nonmembers of the Political Community Have Historically Been Restricted from Bearing Arms.

As discussed *supra*, there is abundant precedent before, during, and after the American Revolution for disarming nonmembers of the political community. Massachusetts and Virginia forbade the arming of Native Americans. *See Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment); *Jimenez-Shilon*, 34 F.4th at 1047; Malcolm, *supra*, at 140. Consistent with the English understanding of the connection between fealty to the Church of England and membership in the English political community, Virginia prohibited Catholics from owning arms unless they swore "allegiance to the Hanoverian dynasty and to the Protestant succession." Churchill, *supra* at 157. During the American Revolution, colonial governments disarmed persons who refused to "swear an oath of allegiance to the state or the United States." Cornell & DeDino, *supra* at 506; *see id.* at 506 nn.128-29 (collecting statutes); *see generally* Churchill, *supra* at 159 ("[T]he new state governments ... framed their police power to disarm around a test of allegiance."). During the ratification debates, the New Hampshire ratification convention proposed an amendment stating that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion," while delegates urged the Massachusetts convention to propose a similar amendment guaranteeing "peaceable citizens" the right to keep arms. Schwartz, *supra* at 761; *see Heller*, 554 U.S. at 604 (considering ratification conventions' proposals). As the Seventh Circuit recently opined:

> governments have consistently conditioned the right to bear arms on one's allegiance to the sovereign. Allegiance serves as a mark of trustworthiness. And it shows one's willingness to accede to the

---

[10] Of course, this language in *Bruen* makes it clear that the Court need not reach the stage of examining historical analogies to Section 922(g)(5)(A) because that law imposes *no* burden on a *law-abiding citizen's* right to armed self-defense.

> term of social order in exchange for the full benefits of citizenship.
> Aliens as a matter of their status, have not yet affirmed their
> allegiance to the sovereign. That has uniformly served as the basis
> for disarming them. It serves as the basis for § 922(g)(5)(A)'s
> prohibition too.

*United States v. Carbajal-Flores*, 143 F.4th 877, 887-88 (7th Cir. 2025) (internal citation omitted).

The Bill of Rights codified this understanding of the right to bear arms as being connected to citizenship and to membership in and preservation of the political community. *See McDonald*, 561 U.S. at 769-70 ("The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them" (quoting Story, *supra* at 746)). Section 922(g)(5)(A) fits squarely within this historical tradition, and certainly does not "burden a *law-abiding citizen*'s right to armed self-defense" in a manner inconsistent with historical precedent. *Bruen*, 142 S. Ct. at 2133 (emphasis added).

## B.  Section 922(g)(5)(A) Is Analogous to Founding-Era Firearms Restrictions

Defendants argue that these historical precedents are not close enough analogies, because alien disarmament is a novelty in the 20th century and there are no direct comparators to Section 922(g)(5)(A).  Defs. Mots. at 13-16. Yet the defendants frame the question in a misleading manner. Section 922(g)(5)(A) does not prohibit firearm possession by *all* immigrants, but rather prohibits aliens "*illegally or unlawfully* in the United States" from shipping, transporting, possessing, or receiving any firearm or ammunition in or affecting interstate or foreign commerce. 18 U.S.C. § 922(g)(5)(A) (emphasis added). The relevant phenomenon of *illegal* immigration is one of more recent provenance than the Second Amendment.

"The federal government first forayed into the realm of immigration legislation during the 1870s.  One decade later, the 1882 Chinese Exclusion Act prohibited Chinese laborers from entering the United States for ten years." *United States v. Munoz-De La O*, No. 2:20-CR-134-RMP-1, 2022 WL 508892, at *1 (E.D. Wash. Feb. 18, 2022); *see also* U.S. Citizenship and Immigration Services, Early American Immigration Policies, https://www.uscis.gov/about-us/our-history/overview-of-ins-history/early-american-immigration-policies (July 30, 2020) (last accessed December 29, 2025) ("Americans encouraged relatively free and open immigration during the 18th and early 19th centuries, and rarely questioned that policy until the late 1800s."). In the context of a country that initially drew no connection between the manner of an immigrant's arrival and lawbreaking, there was no need to explicitly restrict any immigrant's possession of firearms (even if, as discussed *supra*, the common understanding was that noncitizens had no affirmative *right* to bear arms). After the problem of *illegal* immigration emerged, by contrast, "Congress ha[d] every right to conclude that those who show a willingness to defy our law are candidates for further misfeasance or at least a group that ought not be armed when authorities seek them." *Perez*, 6 F.4th at 456 (quotation marks and alteration omitted); *see also Meza-Rodriguez*, 798 F.3d at 673 (recognizing that "unauthorized noncitizens" are more "difficult to track" and "have an interest in eluding law enforcement"); *Huitron-Guizar*, 678 F.3d at 1170 ("Congress may have concluded that illegal aliens, already in probable present violation of the law, simply do not receive the full panoply of constitutional rights enjoyed by law-abiding citizens. Or that such individuals, largely outside the formal system of registration, employment, and identification, are harder to trace and more likely to assume a false identity."); *Carpio-Leon*, 701 F.3d at 982-83 (similar).

21

In *Bruen*, the Supreme Court recognized that courts should be mindful of changing societal conditions in evaluating how closely a challenged regulation must conform to historical precedent. "While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 142 S. Ct. at 2132.

> To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 2133.

Illegal immigration is an issue that substantially postdates the Second Amendment. Accordingly, the Government need not identify "a dead ringer for historical precursors," but rather must identify only "a well-established and representative historical analogue." *Id.* The Government has done precisely that here, pointing to laws barring Native Americans, Catholics, and Loyalists from bearing arms. While some of these classifications—such as those based on race or religion— are abhorrent and of course "would be unconstitutional today" under other constitutional provisions, *Drummond v. Robinson Twp.*, 9 F.4th 217, 228 n.8 (3d Cir. 2021) (quotation marks omitted), they nevertheless show that the right to bear arms was understood to be subject to the government's limitation of that right to those within the political community. Today, by virtue of laws prohibiting immigration outside of authorized channels and criminalizing the violation of those laws, Congress has clearly expressed its understanding that undocumented immigrants are not members of the political community and not entitled to the full panoply of rights afforded to

U.S. citizens, including the right to bear arms under the Second Amendment. *See Carpio-Leon*, 701 F.3d at 982 ("[W]hen Congress regulates illegal aliens by prohibiting them from possessing firearms, it is functioning in a special area of law committed largely to the political branches, and on which we owe Congress special deference." (citations omitted)).[11]

The Court should find that the defendants are not among "the people" to whom the Second Amendment guarantees the right to bear arms.   And even if they are, Section 922(g)(5)(A)'s prohibition on the possession of firearms by undocumented immigrants is consistent with and analogous to this Nation's historical practice of denying the right to possess firearms by those deemed outside the political community. Accordingly, the Court should deny the defendants' motion to dismiss the Superseding Indictment.

---

[11] The Supreme Court has held that "the responsibility for regulating the relationship between the United States and our alien visitors"—determinations about which noncitizens should be allowed to enter and remain in the United States and the terms and conditions imposed upon such noncitizens while they are here—is "committed to the political branches" of government. *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). In exercising that power, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Id.* at 80. And because Congress's "power over aliens is of a political character," its exercise of that power is "subject only to narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976); *see Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953) (holding that congressional power over noncitizens is "largely immune from judicial control").

## CONCLUSION

For the aforementioned reasons, this Court should deny the defendants' motion to dismiss the Superseding Indictment in its entirety.

Dated: December 29, 2025
New York, New York

<div style="margin-left:50%">

Respectfully submitted,

JAY CLAYTON
United States Attorney for the
Southern District of New York

By: _Mostafa Khairy_
Mostafa Khairy
Special Assistant United States Attorney
Tel.: 212-637-2406

</div>

cc: Florian Miedel, Esq. (by ECF)
    *Counsel for Mora Nunez*

Neil Kelly, Esq. (by ECF)
    *Counsel for Aybar-Berroa*