ABELL ESKEW LANDAU

JARROD L. SCHAEFFER
646-970-7339 (direct dial)
jschaeffer@aellaw.com
aellaw.com

256 Fifth Avenue, 5th Floor
New York, New York 10001

September 21, 2026

**By ECF**

Honorable Loretta A. Preska
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: *United States v. Miguel Francisco Mora Nuñez*, S1 25 Cr. 367 (LAP)**

Dear Judge Preska:

On the night of July 19, 2025, Miguel Francisco Mora Nuñez made grave mistakes that resulted in horrible injuries to another individual and to himself. He has taken full responsibility for those actions, pleading guilty to the sole count with which he was charged and endorsing a calculation under the U.S. Sentencing Guidelines (the "Guidelines") that takes into account both his actual offense and the serious harm that resulted from it. As the U.S. Probation Department ("Probation") agrees, that calculation yields a significant sentencing range as punishment for Mr. Mora Nuñez's offense and related conduct. Mr. Mora Nuñez understands the seriousness of his actions, deeply regrets his conduct, and accepts that a sentence in line with Probation's advisory Guidelines calculation is appropriate here.

The Guidelines alone do not give a full picture of Mr. Mora Nuñez, however, whose struggles since childhood have greatly influenced the choices that led him to this point. He has survived incredible trauma, tragedy, and abuse, and now—having hit rock bottom—desires only to pay his debt to society and pursue a safer and better future for his family. Incarcerated at the Metropolitan Detention Center ("MDC") in Brooklyn for over a year since his arrest, Mr. Mora Nuñez has already experienced the harsh conditions of confinement at that facility known so well to judges in this district. And for the rest of his life, he will carry physical scars and ailments as a painful reminder of how his fateful decision on July 19th to carry a loaded firearm while attempting a small-time robbery quickly spiraled out of control.

For the reasons discussed below, Mr. Mora Nuñez respectfully requests that the Court impose a sentence at the bottom of his advisory Guidelines range of 78 to 97 months, which would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing in this case.

## I. Procedural History and Application of the Sentencing Guidelines

Mr. Mora Nuñez was charged by complaint on July 23, 2025, with one count of illegally possessing ammunition, in violation of 18 U.S.C. § 922(g)(5).[1] (*See* Dkt. 1.) He was arrested and presented on July 31, 2025. (*See* Dkt. 9.) On or about August 13, 2025, the grand jury returned an indictment charging Mr. Mora Nuñez with the same offense. (*See* Dkt. 12.) And on or about November 13, 2025, the grand jury returned a superseding indictment again charging Mr. Mora Nuñez with the same offense. (*See* Dkt. 24.) He pled guilty to that offense on May 4, 2026, without the benefit of a plea agreement.

Mr. Mora Nuñez agrees with the advisory Guidelines calculation determined by Probation. That calculation found that his Criminal History Category is I and his total adjusted offense level is 28, resulting in an advisory Guidelines range of 78 to 97 months' imprisonment. (Final Presentence Report as to Miguel Francisco Mora Nuñez dated July 31, 2026 ("PSR") ¶ 106.)

## II. A Sentence Within the Advisory Guidelines Range is Appropriate

### *A. Applicable Law*

As the Court is aware, after *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines are no longer mandatory. *Id.* at 264. However, because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), the Court must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49; *see also United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (stating that the Guidelines "cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges"); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and Section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").

Following the Court's calculation of the advisory Guidelines range, it then must consider the factors outlined in Title 18, United States Code, Section 3553(a), which include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) "the kinds of sentence and the sentencing range established for" similarly-situated defendants by the Guidelines; (5) "any pertinent policy statement" promulgated by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and (7) "the need to provide restitution to any victims of the offense." *Id.* § 3553(a)(1)–(7).

[1] Mr. Mora Nuñez's co-defendant, Christhian Aybar-Berroa, was charged in the same instrument with other offenses. (Dkt. 1.)

In determining the appropriate sentence, courts must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2)(A)–(D).

Ultimately, "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008). But in exercising that discretion, the Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)" identified above, which requires the Court to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)" that emphasize "proportionality, deterrence, incapacitation, and rehabilitation." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) (quoting *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010)). In making that assessment, the Court must "consider every convicted person as an individual," and its sentence must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (citations omitted).

### *B. Mr. Mora Nuñez's History and Characteristics*

#### 1. A difficult childhood and background greatly influenced the troubled path that led him to this point.

Mr. Mora Nuñez was born on October 5, 2003, in Santo Domingo, Dominican Republic. (PSR ¶ 74.) He will turn 23 years old on the date of his sentencing and has four half-siblings on his mother's side, and approximately twenty half-siblings on his father's side, and he was raised primarily by his maternal grandmother. (PSR ¶¶ 74–77.) Mr. Mora Nuñez's parents were never involved during his childhood—in fact, his first memory of his mother was her attendance at his tenth birthday party, and he did not meet his father until he was approximately 17 years old. (PSR ¶ 77.)

Although his grandmother did her best to shield him from the harsh reality of their impoverished circumstances and rough neighborhood, Mr. Mora Nuñez's childhood was grim. (PSR ¶ 78.) As he recounted to Probation, his memories of that period include lacking food and other basic necessities, while witnessing and experiencing horrendous violence—even multiple homicides—before he was 16 years old. (PSR ¶ 78.) Amidst the chaos and violence that surrounded them, Mr. Mora Nuñez's grandmother tried to ensure that he was able to attend school and get an education. (PSR ¶ 79.) When his school stopped providing him with supplies that he could not afford, Mr. Mora Nuñez was forced to try and fund his own education by working several

jobs in the community, including shining shoes, selling chicharrón,[2] and washing windows. (PSR ¶ 79.) Eventually exhausted by those efforts, however, and without positive models or support to facilitate his continued education, Mr. Mora Nuñez stopped attending school shortly after he turned 12 years old. (PSR ¶ 79.) Around the same time, Mr. Mora Nuñez experienced other trials that robbed him of a safe childhood, suffering regular abuse at the hands of his uncle, "Coquito," who abused alcohol and would repeatedly and randomly beat Mr. Mora Nuñez. (PSR ¶ 80.) Although his grandmother tried to protect him from that, too, her attempts were futile and only fueled more chaos by spawning fights between the two adults. (PSR ¶ 80.) Coquito continued physically abusing Mr. Mora Nuñez for years, stopping only when Mr. Mora Nuñez had grown enough to defend himself against his uncle's assaults. (PSR ¶ 80.)

The one bright spot of Mr. Mora Nuñez's younger years was his longtime girlfriend and partner, whom he met when they were both 14 years old. (PSR ¶ 82.) She became a source of safety and comfort amidst the abuse that Mr. Mora Nuñez was enduring at home. (PSR ¶ 83.) Unfortunately, they were forced to separate shortly thereafter, when she moved to the United States. (PSR ¶ 82.) Without the comfort and security of that relationship, Mr. Mora Nuñez experienced a profound sense of isolation that compounded the daily difficulties he already faced. Seeking solace and to escape his circumstances, Mr. Mora Nuñez began stumbling down an ominous path—drinking alcohol and experimenting with drugs at a shockingly young age—that led him to where he is today. (PSR ¶¶ 95–96.)

Those dark clouds only deepened in light of the traumatic violence that Mr. Mora Nuñez witnessed while still in Santo Domingo. He lived in a dangerous neighborhood where he witnessed "people fighting with machetes, individuals shooting one another over drug territory, and prostitution activity." (PSR ¶ 78.) "Between the ages of 15 and 16," he watched "two people get shot and killed." (PSR ¶ 78.) He also witnessed the death of his "paternal brother, John Mora, who was shot and killed by a police officer during an argument."[3] (PSR ¶ 78.)

Eventually, Mr. Mora Nuñez came to the United States in search of a better life.[4] (PSR ¶ 81.) But given his lack of education and modest circumstances, he faced significant obstacles. After arriving in New York, Mr. Mora Nuñez began living with his sister in the Bronx. (PSR ¶ 81.) He lived there for approximately two years before moving in with his girlfriend, with whom he reconnected and rekindled a relationship. (PSR ¶¶ 81–83.) During that period, Mr. Mora Nuñez made a meager living from a job at a bodega and a settlement from an accident in which he was hit by a car. (PSR ¶ 100.) However, he has continued to struggle with alcohol and substance abuse that began during his difficult upbringing and readily agrees that he would benefit from treatment. (PSR ¶¶ 95–97.)

In 2025, Mr. Mora Nuñez and his girlfriend welcomed their now one-year-old daughter. (PSR ¶¶ 82–83.) Those two people continue to be the most important in the world to Mr. Mora

---

[2] Chicharrón is a popular snack in many places that traditionally is made from deep-fried or rendered pork skin, belly, or ribs.

[3] Mr. Mora Nuñez believes the officer was arrested for the shooting. (PSR ¶ 78.)

[4] As Miguel admitted during his allocution, he does not have legal status in the United States.

Nuñez, and it has been painful to be separated from them following his offense—especially given his severe injuries that resulted from the unplanned events of July 19th.

**2. His struggles with substance abuse have hampered his ability to make sound and responsible choices.**

As detailed in the PSR (*see* PSR ¶¶ 95–97) and discussed further by Gabrielle Falcone, LMSW, Mr. Mora Nuñez has a "history of polysubstance use beginning while he was still living in the Dominican Republic" where "he began using marijuana, cocaine, and what he understood to be 'molly' or MDMA" when he was very young. Ex. A (Rep. of Gabrielle Falcone) at 3.

During his interview with Probation, Mr. Mora Nuñez recounted that he first consumed alcohol at age 13 and thereafter began drinking alcohol frequently. (PSR ¶ 95.) After coming to New York, Mr. Mora Nuñez recalled that about the only nights that he did not drink were those when he was caring for his daughter. (PSR ¶ 95.) His drinking became so bad that he reportedly was hospitalized for alcohol poisoning twice. (PSR ¶ 95.) Around the same time that he began drinking, Mr. Mora Nuñez also started smoking marijuana. (PSR ¶ 96.) And by a few years later, he was using ecstasy, MDMA, and cocaine, though he stopped consuming the latter after coming to the United States and instead began taking Percocet. (PSR ¶ 96.)

This substance abuse bears directly on Mr. Mora Nuñez's offense of conviction, as he "acknowledge[d]" to Ms. Falcone "that on the night of his offense he was significantly intoxicated . . . [and] began drinking earlier that evening and consumed approximately three small bottles of whiskey and three to four tablets that he understood to be ecstasy."[5] Ex. A at 4. That evening he "had consumed more than he intended while simultaneously drinking alcohol and recalls feeling markedly affected." *Id.* While "[h]is intoxication does not excuse conduct for which he is ultimately determined to be responsible," it nevertheless "provide[s] relevant clinical context when considering his perception, impulse control, and capacity to respond rationally during a sudden armed confrontation." *Id.* It also demonstrates that experiences during his difficult childhood, including early exposure to dangerous and addictive substances, impacted Mr. Mora Nuñez's ability to make responsible choices as a young man residing in New York.

As Ms. Falcone observes, "Miguel's account reflects the inherent danger of repeated use of illicitly manufactured substances, the composition, dosage, and potency of which cannot be reliably determined by the consumer" and "[h]is own description suggests that drug use had become normalized within his social environment and was occurring alongside alcohol consumption." Ex. A at 3. While his "established pattern of polysubstance use involving stimulants, marijuana, benzodiazepines, and alcohol" does not "excuse the conduct presently before the Court," neither should it "be treated as incidental to his psychosocial history." *Id.* In Ms. Falcone's view, "it identifies an area of significant clinical need" and she believes that "Miguel

5 Mr. Mora Nuñez likewise previously informed Probation "that when he was arrested for the instant offense, he was drunk and under the influence of [e]cstasy." (PSR ¶ 97.) Mr. Mora Nuñez provides this information as context for his actions on the evening of July 19; he does not suggest that his intoxication negates any element of the offense to which he pled. *See, e.g.*, *United States v. Sewell*, 252 F.3d 647, 651 (2d Cir. 2001) (holding that "voluntary intoxication does not negate the intent element of a crime of general intent").

would benefit from comprehensive substance-use assessment and treatment aimed at relapse prevention, improved decision-making, and sustained sobriety." *Id.* In his interview with Probation, Mr. Mora Nuñez stated that he intends to pursue such treatment in the future, including while serving his sentence. (PSR ¶ 97.)

**3. Nevertheless he continues to enjoy support from his family, who will help him to build a better life upon his eventual release.**

Despite the circumstances, Mr. Mora Nuñez still enjoys love and support from his family and those closest to him. His longtime girlfriend and the mother of his daughter says that she "know[s] a side of him that maybe cannot be seen in this situation," and that she "believe[s] that being far from his family and his parents, who are humble and decent people, affected him a great deal." Ex. B (Ltr. from Carolina Esther del Carmen).[6] She does not seek to justify what Mr. Mora Nuñez has done, but wants the Court to know that underneath his "immaturity" Mr. Mora Nuñez "is a compassionate and caring person despite his mistakes, with a daughter waiting for him and praying to God that he will change." *Id.*

Mr. Mora Nuñez's elderly grandmother, who effectively raised him, likewise writes that while "[t]his situation has been very painful for our family, and especially for [her]," she "know[s] [her] grandson as a person who has good qualities, feelings, and a family that loves him and is willing to support him." Ex. B (Ltr. from Carlita Tejeda). And Mr. Mora Nuñez's mother, with whom he has recently reconnected (*see* PSR ¶ 77), also writes "with great respect to ask that, at the moment [the Court] make[s] [its] decision, [the Court] consider giving [her] son an opportunity" because while she "know[s] he has made mistakes," she "firmly believe[s] that a person can also change and learn from them . . . and have the opportunity to build a better path." Ex. B (Ltr. from Mirelis Maria Nuñez).

These letters reveal that those closest to Mr. Mora Nuñez know and believe in good aspects of his character that are not evident from his conduct in this case. It also appears that he will have a support system when he is ultimately released from prison and, in all likelihood, deported. His aunt writes, for instance, that she and her family "are willing to support him so that he can correct his mistakes, move away from bad decisions, and build a different future." Ex. B (Ltr. from Caridad Altagracia Gross).

***C. Legitimate Purposes of Sentencing***

**1. A sentence within the advisory Guidelines range calculated by Probation would adequately reflect the seriousness of this offense, promote respect for the law, and provide just punishment.**

There is no question that the offense for which Mr. Mora Nuñez is being sentenced is serious in nature. Even had Victim-1 and Mr. Mora Nuñez not both been seriously injured,

---

[6] The letters provided in support of Mr. Mora Nuñez are written in Spanish. Translations copies have been requested from a certified interpreter and will be promptly filed once received. Uncertified translations of relevant portions are included here for the Court's convenience.

whenever firearms are discharged there is an unacceptable risk of grievous harm or worse. Mr. Mora Nuñez accepts that such conduct warrants substantial punishment.

At the same time, the advisory Guidelines range calculated by Probation recommends a period of incarceration from 78 to 97 months—a period of between approximately 6.5 to 8 years. For a 23-year-old individual, that length of time represents about a quarter to a third of his entire life thus far. It is a substantial punishment that sufficiently reflects the seriousness of this offense, promotes respect for the law, and provides just punishment. And "beyond the offender's actual deprivation of liberty when incarcerated, a host of other penalties and burdens always attend criminal conviction," including, among others, "losses of family life, of socioeconomic status, of employment and career opportunities; diminution of certain civil rights and entitlements; and countless humiliations and indignities commonly associated with living in confinement." *United States v. Mateo*, 299 F. Supp. 2d 201, 210 (S.D.N.Y. 2004). Mr. Mora Nuñez has suffered and will continue to endure those as part of any sentence this Court imposes.[7]

The Court should also take into consideration Mr. Mora Nuñez's medical history and needs in computing an appropriate sentence. During the instant offense, Mr. Mora Nuñez suffered severe injuries including [redacted] (PSR ¶ 86.) To address those injuries, he underwent several procedures to identify and treat his injuries and was admitted as an inpatient for nearly an entire month preceding and following his arrest. (PSR ¶ 86.) Despite those interventions, Mr. Mora Nuñez still requires extensive additional and ongoing care and "has been evaluated for [redacted] on multiple occasions," while being prescribed a long list of medications including [redacted] to treat his symptoms." (PSR ¶ 86.) Mr. Mora Nuñez's medical issues are in part the result of his own actions on the night of July 19, and he certainly was not the only one who suffered serious injuries that night. Nonetheless, they are real and persisting factors that the Court should consider.

A proportionate sentence should also take into account that Mr. Mora Nuñez has been incarcerated at the MDC for over a year—an experience that has had a profound effect on him. Mr. Mora Nuñez reports that he has been assaulted by officers at the MDC, which caused him to "suffer a broken hand" and become "temporarily unable to move his legs." (PSR ¶ 87.) While

---

[7] Some of those "humiliations and indignities" have been particularly acute in this case given the government's decision to repeatedly publicize and excoriate Mr. Mora Nuñez across various media. *See, e.g.*, https://www.dhs.gov/news/2025/07/21/secretary-noem-hosts-press-conference-provide-updates-shooting-customs-and-border; https://www.dhs.gov/news/2026/01/09/secretary-noem-announces-success-operation-salvo-new-york-city-following-shooting; https://www.dhs.gov/news/2025/07/20/video-criminal-illegal-alien-lengthy-rap-sheet-ambushes-and-shoots-cbp-officer-new. Despite previously assuring this Court that it "ha[d] undertaken efforts to advise relevant law enforcement agencies . . . of the requirements, and prohibitions, of Local Rule 23.1(h)"—a representation that the Court "accept[ed]" and relied upon in denying a prior motion addressing such conduct (Dkt. 46 at 2–3)—as of the filing of this submission, the same material is still publicly available. And the government will likely publicize this case yet again after this Court imposes its sentence by issuing additional press releases and statements.

evidence substantiating such claims can be difficult to obtain, portions of his medical records do corroborate his account. Specifically, medical records from the Bureau of Prisons and an outside hospital confirm that he was diagnosed with a "partially healed sub-acute chronic fracture of the fifth metacarpal bone." (PSR ¶ 87.) Upon his return to the MDC, medical staff there determined that his injury "did not occur during the 24 hrs he was at MDC, 3 days ago." Ex. C.[8] By that time, however, Mr. Mora Nuñez had been in federal custody for approximately two weeks and so it remains unclear how his injury was sustained.

Courts in this Circuit have repeatedly acknowledged violent conditions at the MDC. *See, e.g.*, *United States v. Colucci,* 743 F. Supp. 3d 452, 458 (E.D.N.Y. 2024) ("Chaos reigns, along with uncontrolled violence. [ . . . ] Through review of sealed documents, official government statements, judicial opinions and news media reports, this Court has identified shocking instances of brutal violence within the facility.") (internal citations omitted); *United States v. Chavez,* 710 F. Supp. 3d 227, 233–35 (S.D.N.Y. 2024) ("The conditions at the MDC are dreadful in many respects . . . [I]nmates at the MDC spend an inordinate amount of time on 'lockdown' — that is, locked in their cells, prohibited from leaving for visits, calls, showers, or exercise . . . [and] the MDC's physical conditions have long been problematic."). "Allegations of inhumane treatment at MDC continue, [] and judges in this district are subject to a steady drumfire of such charges, often uncontested by prosecutors . . . [a]nd these issues continue to affect judicial determinations." *Colucci*, 743 F. Supp. 3d at 455; *see also United States v. Santana*, No. 22 CR. 368, 2024 WL 2275037, at *2 (S.D.N.Y. May 20, 2024) ("Given the severe prison conditions that prevail at the MDC (conditions that amount to imposing harsher punishments on prisoners), this Court and others have adjusted sentences of defendants in custody there for lengthy periods.").

As Ms. Falcone recounts, Mr. Mora Nuñez reports that he has experienced similar difficulties and mistreatment leading to a "degree of fear . . . while incarcerated [that] is clinically significant." (Ex. A at 5.) In short, "there are far too many cases to cite" that reflect the dangerous conditions at the MDC. *Chavez*, 710 F. Supp. 3d at 228 n.3 (collecting "representative examples" of "near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care"). And in fashioning a just punishment for Mr. Mora Nuñez, this Court should take into account where a year of his anticipated sentence has been served.

**2. A sentence within Probation's advisory Guidelines range would sufficiently deter criminal conduct and protect the public from further crimes of the defendant.**

Considerations of deterrence in the context of sentencing are generally divided into an analysis of general and specific deterrence. As to the former, "research shows the data on the effect of harsh sentences, including but not limited to incarceration, as a general deterrent is mixed at best." *United States v. McCarthy*, No. 22 Cr. 491 (NRM), 2023 WL 3741996, at *3 n.1 (E.D.N.Y. May 30, 2023). Rather, such "[r]esearch suggests that general deterrence is primarily a function of the certainty of punishment and not its severity." *United States v. Gallego*, No. 95 Cr. 284 (LAK), 2025 WL 723237, at *5 n.42 (S.D.N.Y. Mar. 6, 2025). Given the highly publicized nature of Mr. Mora Nuñez's case, the zeal with which it has been pursued by the government, his

[8] Because Exhibit C is a medical record, it has been provided under separate cover.

plea of guilty, and the likelihood that he will receive a sentence including a substantial period of incarceration, any concerns about promoting general deterrence have already been satisfied.

As to specific deterrence, or protecting the public from further crimes committed by Mr. Mora Nuñez, no additional incarceration is necessary. He will almost certainly be deported from the United States after serving any period of incarceration and prevented from returning. That fact alone is a practical barrier to any harm from future crimes that he might theoretically commit. In order for a court to arrive at a "properly calibrate[d] 'just punishment,'" it must "consider the collateral effects of a particular sentence." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009); *see also Rosario Gonzalez v. United States*, No. 23 CR 186, 2025 WL 1381499, at *2 (S.D.N.Y. May 12, 2025) (applying a "substantial downward variance" where it was certain a defendant would be deported after his sentence concluded); *United States v. Chong*, No. 13 CR 570, 2014 WL 4773978 at *1 (E.D.N.Y. Sept. 24, 2014) (Weinstein, J.) ("Application of routine sentencing principles should lead district courts to account for the prospect of deportation when considering imposition of a term of incarceration.").

More fundamentally, however, any risk of future crimes committed by Mr. Mora Nuñez would be substantially reduced by "a proportionate and productive resolution" that "provide[s] substantial punishment without unnecessarily imposing incarceration on a young life," as Ms. Falcone opines that "[m]eaningful substance-use treatment, trauma-informed mental health services, educational and vocational programming, and continued connection with his family would offer Miguel opportunities to develop the stability and judgment that were notably absent during his childhood and the period preceding his arrest." Ex. A at 6.

**3. A sentence within Probation's advisory Guidelines range would provide Mr. Mora Nuñez with needed educational training, medical care, or other correctional treatment in the most effective manner.**

A sentence within Probation's advisory Guidelines range would provide ample opportunity for Mr. Mora Nuñez to take advantage of any educational training, drug treatment, medical care, or other correctional programs that may aid in his rehabilitation.

Importantly, Congress has determined that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). "Accordingly, although sentencing courts are permitted to *discuss* the issue of rehabilitation when crafting a sentence, . . . it is clear that courts may not extend the length of an incarceratory sentence in order to *accommodate* the requirements of rehabilitation." *United States v. Keenan*, 499 F. App'x 81, 82 (2d Cir. 2012) (internal citations omitted) (emphasis in original). Regardless, there would be little need to do so here, as Probation's advisory Guidelines range recommends a sufficiently long period that Mr. Mora Nuñez will be able to pursue available rehabilitative programs.

## III. Conclusion

"In deciding what sentencing will be 'sufficient, but not greater than necessary' to further the goals of punishment . . . a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (quotations omitted). Mr. Mora Nuñez understands and accepts the

seriousness of his offense, and he deeply regrets his actions. At 23 years old, however, there is still sufficient time for him to fashion a new, law-abiding life with his family following his completion of a proportionate sentence. Because the advisory Guidelines range calculated by Probation recommends a sentence that would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing in this case, Mr. Mora Nuñez respectfully requests that the Court impose a sentence at the bottom of that range.[9]

Respectfully submitted,

*Jarrod L. Schaeffer*

Jarrod L. Schaeffer

ABELL ESKEW LANDAU LLP
256 Fifth Avenue, 5th Floor
New York, NY 10001
(646) 970-7339
jschaeffer@aellaw.com

Enclosures

cc: Counsel of Record

---

[9] Pursuant to U.S.S.G. § 5G1.3(c), the Court's sentence should be imposed to run concurrently to any state sentence that may be imposed on charges which constitute conduct relevant to this offense. The Court should not impose a fine, as Mr. Mora Nuñez does not have the ability to pay one.