# Exhibit A

F / M

FALCONE-MAGUIRE MITIGATION

Twenty-two year old Miguel Francisco Mora Nunez stands before the Court facing very serious allegations. The current legal matter has received significant media attention due mainly to the fact that the other person involved appears to have been, at the time, an off-duty federal U.S. Immigration and Customs Enforcement officer. While there is no indication that Miguel knew that, as a result of government press statements and the media's narrative, Miguel's name, immigration status, and alleged conduct became part of a much broader public conversation in the days that followed. Lost within that coverage, however, was the young person behind the headlines—and a factual and clinical history considerably more complicated than the public narrative suggests.

This memorandum does not intend to minimize the gravity situation. It does, however, seek to provide the Court with information that could not be captured in a headline, charging instrument, or description of a single night.[1] Miguel should be held accountable for conduct the Court ultimately determines to be his responsibility, but that accountability should be informed by the totality of the person being sentenced. Miguel is more than the worst allegations made against him and the events of July 19, 2025, should be considered within the fuller context of the life that preceded them and the future that remains possible.

---

[1] This memorandum is based on my discussions with Miguel and review of both publicly available material and certain case materials provided to me by his counsel.

**Family, Childhood & Early Development**

Miguel Francisco Mora Nunez was born in 2003 in Santo Domingo, Dominican Republic, to Ms. Mireille Maria Nunez Tejeda and Mr. Arnulfo Jesus Mora. His mother still resides in a rural area outside of Santo Domingo. His father's current whereabouts are unknown to Miguel. Although both of his parents remain living, neither served as his primary caregiver for much of his childhood. Miguel describes his relationships with them today as limited, explaining, *"It's not that strong. I only started talking to them recently, but I don't talk to them much."*

Despite an unusually large and geographically dispersed family—Miguel estimates that he has approximately 20 siblings and half-siblings—he maintains meaningful connections with on a few of them. Miguel is the oldest of three siblings via his mother and father, and the remaining 16 siblings are half maternal or half paternal. *"There's 20 of us, I am not exaggerating. My mother only has five children. The others are mostly my dad's. I'm the oldest of a small group of three of us."* He speaks particularly warmly of his youngest paternal half-brother, explaining, *"I really have a lot of love for the little one of our group. I try to help him, give him advice, things like that."*

Miguel's strongest desire for family connection is now most evident in his relationship with his own young daughter. Before his incarceration, Miguel lived in the Bronx with his longtime partner and their one-and-a-half-year-old daughter. Although incarceration has physically separated them, Miguel reports remaining in as much contact as possible with his daughter.

As described by Miguel, his early history is characterized by disrupted parental attachment and exposure to physical violence within the family environment. Miguel was raised primarily by his grandmother, whom he identifies as the central caregiver of his childhood. When asked why he was raised apart from his parents, Miguel could offer little explanation beyond, *"I don't really know, but that's what happened."* His recollection during discussions regarding his childhood reflects a situation in which major caregiving arrangements appear to have been determined around him, rather than made with or explained to him.

Nor was Miguel's childhood without other adversity as his educational opportunities were also limited; he attended school only until a young age before leaving formal education to earn money however he could. His transition from childhood into adult responsibilities therefore occurred considerably earlier than would typically be expected. He recalls, *"I was going to school in Santo Domingo before I went to my grandmother's, and my grandmother put me in a different school. I stayed in that school until the seventh grade. I left school and I began working to make money . . . ."*

**Substance Use History**

Miguel reports a history of polysubstance use beginning while he was still living in the Dominican Republic. There, he began using marijuana, cocaine, and what he understood to be "molly" or MDMA. After coming to the United States, his substance use continued and expanded to include ecstasy and Xanax. As Miguel explained, *"I started using drugs in Santo Domingo. I was using molly [form of MDMA] in Santo Domingo and using marijuana too. Here I picked up the habit of ecstasy. Here I started using Xanax as well."* Of particular concern was Miguel's pattern of ecstasy use. He describes obtaining illicitly manufactured pills, but denies ever selling them. He also understood that at least some of the individuals supplying these substances were independently pressing the tablets rather than obtaining them through any regulated pharmaceutical source.

Miguel's account reflects the inherent danger of repeated use of illicitly manufactured substances, the composition, dosage, and potency of which cannot be reliably determined by the consumer. His own description suggests that drug use had become normalized within his social environment and was occurring alongside alcohol consumption. By the time of the instant offense, Miguel was not experimenting with substances for the first time; rather, he had developed an established pattern of polysubstance use involving stimulants, marijuana, benzodiazepines, and alcohol.[2]

Miguel's substance-use history should neither excuse the conduct presently before the Court nor be treated as incidental to his psychosocial history. Rather, it identifies an area of significant clinical need. At twenty-two years old, with a history of polysubstance use beginning during adolescence or early adulthood and escalating to frequent use of illicitly manufactured pills, Miguel would benefit from comprehensive substance-use assessment and treatment aimed at relapse prevention, improved decision-making, and sustained sobriety. I understand that he has indicated that he wishes to pursue such treatment while serving his sentence.

Miguel's history is not offered to excuse his conduct. It is offered because context matters. He entered adulthood with limited education, an established pattern of substance misuse, and a history that included childhood instability and violence. He arrived in the United States at just 19 years old and, only a few years later, now finds himself navigating parallel federal and state prosecutions while carrying significant physical injuries from the shooting underlying this case.

---

[2] Miguel now reports abstaining from illicit substances while incarcerated. Apart from the restrictions of his controlled environment, he also attributes this decision in part to his awareness of fentanyl contamination within the institutional drug supply.

**Additional Factors Relevant to Miguel's Psychological State**

Miguel acknowledges that on the night of his offense he was significantly intoxicated, stating that he began drinking earlier that evening and consumed approximately three small bottles of whiskey and three to four tablets that he understood to be ecstasy. Miguel describes becoming extremely hot and sweating heavily after taking those pills, to the extent that he needed to remove some clothing that had been drenched from his own sweat. Extreme heat intolerance and excessive sweating is a common bodily side effect throughout the drug's peak metabolic activation and half-life. These descriptions are noteworthy because illicitly manufactured tablets sold as ecstasy are not regulated pharmaceutical products; their appearance alone cannot establish their chemical composition or dosage. Accordingly, while Miguel believed the pills contained ecstasy/MDMA, it is not possible to conclude precisely what substances or concentrations he actually ingested.

Whatever the precise compounds he ingested, Miguel reports that he had consumed more than he intended while simultaneously drinking alcohol and recalls feeling markedly affected. His intoxication does not excuse conduct for which he is ultimately determined to be responsible. It does, however, provide relevant clinical context when considering his perception, impulse control, and capacity to respond rationally during a sudden armed confrontation.

**Resulting Significant Physical Injury**

For all involved, the result of this reckless shooting was and is extremely serious. As to Miguel, he reports sustaining multiple gunshot wounds and states that a bullet remains lodged near his spine. Following the incident, Miguel was cared for by trauma specialists, where physicians advised that removing the projectile could carry substantial neurological risk. He explains, "*It's too dangerous to take out [bullet be removed], it could render me an invalid. The doctors say that they don't know how I'm walking, that it is a miracle of God.*" He continues to report pain associated with the retained bullet and describes requiring medication related to his injuries while incarcerated.[3] Prison personnel administer pain medications to maintain Miguel's comfortability, but he denies receiving sufficient pain management or necessary physical therapy to ensure his full recovery, explaining that, *"It [the bullet] got lodged in the spine and it still hurts, so they give me medications so I can go to the bathroom and medications for the bullets that are lodged in my back."*

---

[3] Miguel's medical records should ultimately be relied upon to establish the precise number, location, and severity of his wounds.

**Current Incarceration & Impact**

Miguel is presently incarcerated at the Metropolitan Detention Center (MDC) in Brooklyn, where he remains in federal custody. His experience of incarceration has been particularly difficult, both physically and psychologically. He continues to report pain associated with the gunshot injuries that he sustained during the instant incident, including the bullet that he states remains lodged near his spine.

Miguel also reports feeling unsafe within the institution. He describes having been involved in several physical altercations and spending substantial periods in the Special Housing Unit ("SHU"). According to Miguel, some of the difficulties he has encountered stem from other incarcerated individuals associating him with a cousin who is reportedly gang-involved. Miguel adamantly denies that he himself is a gang member. He further emphasizes that, despite the availability of contraband weapons within the facility, he has not received any disciplinary infractions for possessing a knife or other weapon.

More troublingly, Miguel reports experiencing mistreatment by correctional staff. He states that injuries to his hand and leg required treatment at a Brooklyn hospital and describes significant fear surrounding his interactions with officers.[4] The degree of fear he presently reports while incarcerated is clinically significant. Indeed, Miguel does not mince words, stating, *"They're going to kill me in here."*

Ultimately, Miguel speaks about incarceration less in terms of abstract punishment than in terms of survival and separation from his family. His most consistent concern is returning safely to his young daughter. After discussing the dangers he perceives around him and emphasizing that he has avoided possessing weapons while incarcerated, Miguel returned to a simple objective: *"I just want to get out and be with my daughter."*

**Conclusion**

Miguel stands before the Court at only twenty-two years old, facing the possibility of a sentence that may consume a substantial portion of his adult life. The seriousness of the instant matter cannot be minimized. At the same time, however, proportional sentencing requires consideration not only of the offense, but of the individual who will actually serve the sentence imposed.

Miguel remains a young adult with significant treatment needs, substantial unresolved trauma, serious physical injuries, and a history of problematic substance use. Whatever

---

[4] These allegations have not been, and could not be, independently substantiated for purposes of this memorandum and are therefore presented as Miguel's account of his experience.

period of incarceration the Court ultimately determines is appropriate, his eventual stability will depend not simply upon the passage of time in custody, but upon meaningful opportunities to address those underlying needs and prepare for a safer and more productive future.

At such a young age, Miguel's trajectory is not fixed. His significant polysubstance use demonstrates a clear need for intervention, but also identifies a concrete and treatable area of risk. Miguel will face consequences—whether those consequences are a direct result of the legality of this case, or a direct result of his significant injuries. From a clinical and mitigation perspective, a proportionate and productive resolution would provide substantial punishment without unnecessarily imposing incarceration on a young life. Meaningful substance-use treatment, trauma-informed mental health services, educational and vocational programming, and continued connection with his family would offer Miguel opportunities to develop the stability and judgment that were notably absent during his childhood and the period preceding his arrest.

Most importantly, Miguel remains the father of a very young daughter. He speaks frequently about her, tries to maintains contact with her despite his incarceration, and identifies returning to her as one of his strongest motivations for the future. A disposition that takes into account these mitigating factors would not diminish the seriousness of the instant matter. Rather, it would recognize that justice can impose meaningful consequences without foreclosing rehabilitation, family connection, and the possibility of a different future.

Miguel's life should not be reduced to one incredibly unfortunate and harmful night. At 22 years old, there remains a considerable life ahead of him. This social worker respectfully asks the Court to impose a sentence that leaves room for Miguel to make something different of it.

Respectfully submitted,

Gabrielle Falcone, LMSW