**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 23, 2026

**BY ECF**
The Honorable Loretta A. Preska
United States District Judge
Southern District of New York
500 Peal Street
New York, New York 10007

**Re: *United States v. Miguel Francisco Mora Nunez*, S1 25 Cr. 367-1 (LAP)**
***United States v. Christhian Aybar-Berroa*, S2 25 Cr. 367 (LAP)**

Dear Judge Preska:

The Government respectfully submits this letter in advance of the September 28, 2026 *Fatico* hearing (the "Hearing") in the above-referenced matter. The defendants assert multiple factual objections to their Presentence Investigation Reports (the "PSRs"), principally the facts and circumstances surrounding Mora Nunez's shooting of an off-duty Customs and Border Protection ("CBP") Officer ("Victim-1") in the face and arm on or about July 19, 2025, which resulted in life-threatening and permanent injuries. As described in greater detail below, and consistent with the facts set forth in the PSRs, the expected testimony and documentary evidence at the Hearing will prove, by a preponderance of the evidence, that Mora Nunez approached Victim-1 with his firearm raised, then shot Victim-1 in the face and arm, before Victim-1 then returned fire. These facts will establish, contrary to the Probation Office's ("Probation") calculation of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), that the Court should apply attempted murder in the first degree, *see* U.S.S.G. § 2A2.1(a)(1), as the appropriate cross-reference.

## I. Background

### A. Procedural History

On August 13, 2025, a grand jury in this District returned a two-count indictment (the "Indictment") charging Mora Nunez with one count of possession of ammunition by an illegal alien, in violation of 18 U.S.C. § 922(g)(5), and Aybar-Berroa with one count of accessory after the fact to possession of ammunition by an illegal alien, in violation of 18 U.S.C. § 3. *See* Dkt. 13. On November 13, 2025, a grand jury in this District returned a three-count indictment (the "S1 Indictment") against the defendants which contained the same two counts as the Indictment, but with an additional charge against Aybar-Berroa for possession of ammunition by an illegal alien, in violation of 18 U.S.C. § 922(g)(5). *Id.* at 24.

On May 4, 2026, Mora Nunez pled guilty to possession of ammunition by an illegal alien,

in violation of 18 U.S.C. § 922(g)(5), which was Count One of the S1 Indictment. On June 10, 2026, the Government filed a one-count superseding information (the "S2 Information"), charging Aybar Berroa with possession of ammunition by an illegal alien, in violation of 18 U.S.C. §§ 922(g)(5) and 2. Aybar-Berroa then waived indictment and pled guilty to the S2 Information.

Sentencing for both defendants is currently scheduled for October 5, 2026.

### B. The PSRs and the Disputed Conduct

#### 1. Defense Objections

On July 31, 2026, Probation issued a final PSR in advance of the sentencing for Mora Nunez ("MN-PSR").[1] Similarly, on August 28, 2026, Probation issued Aybar-Berroa's final PSR ("AB-PSR"). The defendants largely assert the same factual objections to their PSRs, although Mora Nunez asserts some additional objections to the facts in the MN-PSR.

The defendants' objections can largely be summarized as follows:

- The defendants assert that they did not forcibly rob the Female Victim (as defined in the PSRs) of her cellphone. *See* MN-PSR at 27; AB-PSR at 28;
- The defendants assert that Mora Nunez did not brandish a firearm prior to running up to Victim-1 and Victim-2 (as defined in the PSRs). *See* MN-PSR at 26; AB-PSR at 27;
- The defendants assert that Victim-1, not Mora Nunez, fired his gun first, before Mora Nunez returned fire. *Id.*;
- The defendants assert Mora Nunez did not fire at Victim-1 "at least twice." *Id.*; and
- The defendants assert that Victim-1 fired more than two rounds at Mora Nunez. *Id.*

In addition, Mora Nunez makes the following factual objections to the MN-PSR:

- Mora Nunez asserts his fingerprints were not discovered on the .380 Sig Sauer ammunition tray recovered by law enforcement from Aybar-Berroa's residence. *See* MN-PSR at 27; and
- Mora Nunez objects to the inclusion of MN-PSR ¶ 27, noting that Mora Nunez made threatening statements to a Metropolitan Detention Center ("MDC") Disciplinary Hearing Officer ("DHO"), wherein he stated: "You don't know who I am in the streets. The DHO lady is going to find out the hard way. I am going to send people to get her and the officer who wrote me up. Look me up I'm the guy

[1] Based on the extent and nature of the objections, the Government respectfully reserves its right to argue at sentencing that Mora Nunez and Aybar-Berroa have not demonstrated acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.

who killed the federal officer in uptown Manhattan." *See* MN-PSR at 28.

**2. Government Objection**

The Government agrees with the factual recitation in the PSRs; however, the Government disputes Probation's calculation of the applicable Guidelines range. Specifically, Probation calculated the offense levels for both defendants using the robbery cross-reference, pursuant to U.S.S.G. § 2B3.1. *See* MN-PSR at 30; AB-PSR at 26. Accordingly, Probation determined the total offense level for both defendants to be 28, and since both defendants are in Criminal History Category I, both of their resulting Guidelines are 78-97 months' imprisonment. MN-PSR ¶ 106; AB-PSR ¶ 108.

Based on the evidence in this case, the Government's position is that the applicable Guidelines cross-reference is attempted murder in the first degree, pursuant to U.S.S.G. § 2A2.1(a)(1). If that Guidelines applies, the base offense level would be 33, and since Victim-1 sustained permanent or life-threatening bodily injury, a four-level increase would apply, resulting in a total offense level of 37. In the event the Court determines that the defendants adequately accepted responsibility and reduces the offense level by three, with a final offense level of 34 and Criminal History Category I, the defendants' Guidelines would be 151-180.[2]

## II. Anticipated Proof at Hearing

### A. Applicable Law

"In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3. At a sentencing hearing, *see United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979), the Government bears the burden of proof, and must establish that the facts supporting the calculation of the defendant's offense level are "more likely than not true," *i.e.*, by a preponderance of the evidence. *United States v. Rizzo*, 349 F.3d 94, 98 (2d Cir. 2003); *see also United States v. Garcia*, 413 F.3d 201, 220 n.15 (2d Cir. 2005) ("Judicial authority to find facts relevant to sentencing by a preponderance of the evidence survives Booker."). The Federal Rules of Evidence do not apply to sentencing proceedings, Fed. R. Evid. 1101(d)(3), and, the Court has "largely unlimited" discretion in deciding what information to consider during sentencing. *United States v. Pugliese*, 805 F.2d 1117, 1122 (2d Cir. 1986). In determining whether the proffered evidence is reliable, the Court must assure itself that the evidence is not "materially incorrect," and that there is "some minimal indicia of reliability" accompanying hearsay statements sought to be admitted. *United States v. Martinez*, 413 F.3d 239, 244 (2d Cir. 2005). "[A] sentencing court, like a jury, may base its factfinding on circumstantial evidence and on reasonable inferences drawn therefrom." *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004).

---

[2] The Guidelines would be 151-188 months' imprisonment; however, Section 922(g)(5) has a statutory maximum of 15 years, *i.e.*, a statutory maximum of 180 months.

### B. Discussion

At the Hearing, the Government intends to call one witness, Victim-1. The Government also expects to introduce into evidence the law enforcement video recorded interviews of the Female Victim and Victim-2, which were conducted approximately three hours after the shooting.[3] Further, the Government intends to offer various documentary evidence.[4]

For the reasons that follow, the Government respectfully submits that the evidence and anticipated testimony will prove by a preponderance that: (i) the defendants forcibly robbed the Female Victim of her cellphone; (ii) Mora Nunez approached Victim-1 and Victim-2 while wearing a ski mask and brandishing a firearm, shot his gun first, firing two shots, one of which that struck Victim-1 in the arm and face, and then Victim-1 returned fire at Mora Nunez, firing two shots; (iii) Mora Nunez's fingerprints were found on the ammunition tray inside of Aybar-Berroa's residence; and (iv) Mora Nunez made threatening statements to an MDC DHO and referenced the July 19, 2025 shooting while making those threats.

#### 1. The Defendants Forcibly Robbed the Female Victim

To prove that the defendants forcibly robbed the Female Victim, as described in MN-PSR ¶¶ 10-11 and AB-PSR ¶¶ 10-11, the Government will primarily offer the Female Victim's recorded statement, which was taken by NYPD officers on body-worn camera at approximately 2:15 a.m., shortly after the attempted robbery and Mora Nunez's subsequent shooting of Victim-1. *See* GX 201.[5] That recorded statement will establish that, on July 19, 2025, at approximately 11:45 p.m., Mora Nunez rode on the back of a motorbike driven by Aybar-Berroa. At that time, the defendants drove up to the Female Victim as she sat on a park bench inside Fort Washington Park and robbed her of her cellphone. *Id.* During the robbery of the Female Victim, Mora Nunez and the Female Victim struggled over the Female Victim's phone, but the Female Victim ultimately let go when she "felt like it was going to get aggressive." *Id.* The defendants fled with the Female Victim's cellphone on the motorbike driven by Aybar-Berroa.

#### 2. Mora Nunez Shot First and Fired Twice in Total and Victim-1 Returned Fire Twice

To prove that Mora Nunez approached Victim-1 and Victim-2 while brandishing a firearm which he then used to shoot Victim-1, before Victim-1 fired his own weapon, as described in MN-PSR ¶¶ 13-14 and AB-PSR ¶¶ 13-14, the Government intends primarily to offer the live testimony of Victim-1, a video depicting the shooting (GX 101), and the recorded statement of Victim-2 (GX

---

[3] The defense has agreed that the Government may, *in lieu* of live testimony, play the video recorded statements of the Female Victim and Victim-2, captured on NYPD body-worn camera, the night of the shooting. *See* GX 201, GX 202-A, GX 202-B.

[4] On or about September 10, 2026, the parties conferred and agreed that neither party would object to certain records on authenticity grounds, and therefore, subject to the Court's views, could introduce that evidence, to the extent relevant, at the Hearing without a witness.

[5] "GX" refers to the specific exhibits provided to the Court with the Government's submission in advance of the Hearing.

202-A and GX 202-B).[6] To establish that Mora Nunez fired his gun twice, the Government intends to provide the Court with the New York City Police Department ("NYPD") lab reports showing that one .380 PMC casing and one live .380 Sig Sauer round were recovered from the scene of the shooting, which both came from Mora Nunez's gun (GX 301-A; GX 301-B). To establish that Victim-1 fired his gun twice, the Government will offer the NYPD lab reports and crime scene reports which show that one 9mm casing was recovered (GX 301-A; GX 301-D); and Victim-1's gun was recovered with 14 rounds in one magazine and 15 rounds in his back-up magazine, as described further below (GX 301-C; GX 302).

The Government anticipates that this evidence will establish that, approximately a few minutes after the robbery of the Female Victim, approximately 100 yards away inside Fort Washington Park, Mora Nunez and Aybar-Berroa identified their next targets: Victim-1 and Victim-2 (collectively "the Victims") who were sitting on rocks alongside the Hudson River. GX 101; GX 202-A.[7] After seeing the Victims sitting by the rocks, Mora Nunez got off the motorbike and approached the Victims while Aybar-Berroa prepared to flee by turning the motorbike around to face the direction they had come from. GX 101.

Mora Nunez approached the Victims from behind while brandishing a gun in his outstretched arm. When Mora Nunez was directly behind them, the Victims turned around and Victim-1 noticed a firearm pointed at his head. GX 101; GX 202-A ("[A]nd then for some reason we both turned around because I guess we felt somebody approaching and then it was a guy with a gun."). The Victims both attempted to take cover, and as they did so, Mora Nunez fired his gun at Victim-1, from less than a few feet away. GX-1 at 00:24; *see infra* **Image-1**.[8]

[6] During her interview with NYPD, Victim-2 initial told the detectives that she believed Victim-1 shot first. *See* GX 202-A at 02:49. However, Victim-2 then clarified stating "but I can't really say, that's just speculation" (*id.*) and then "I can't really say for sure if my friend made the first shot." GX 202-B. Thus, while the defendants argue that this statement by Victim-2 establishes that Victim-1 fired first, Victim-2 indicated to the detectives she was unsure of the sequence of events.

[7] Mora Nunez is wearing the white shirt, riding on the back of the motorbike and Aybar-Berroa is wearing the red shirt and driving the motorbike.

[8] The muzzle flash is circled in red and it is clear from the video that it is fired from Mora Nunez's gun. *See* GX 101 at 00:24-00:26.



**Image-1**

One bullet struck Victim-1 in the right arm and in the face. GX 101. Victim-1, an off-duty CBP officer who at the time was carrying his CBP-issued 9mm Glock pistol, used his firearm to return fire, firing two shots that struck Mora Nunez twice. GX 102; GX 301-A; GX 301-C; GX 302.

After being shot, Mora Nunez ran back towards Aybar-Berroa and the motorbike, and the two got on the motorbike and fled. GX 101.

Following the shooting, law enforcement officers recovered at the scene one live .380 Sig Sauer cartridge and one spent .380 PMC casing, both fired from Mora Nunez's gun. GX 301-A; GX 301-B. The .380 PMC and .380 Sig Sauer ammunition could not have come from Victim-1's gun because Victim-1's gun is a 9mm Glock. GX 301-C; GX 301-D ("[9mm cartridge casing] and [.380 cartridge casing] are ELIMINATED as having been discharged from the same gun based on the observed disagreement of class characteristics.").

This evidence establishes that Mora Nunez shot Victim-1 first, and that, contrary to the defense's assertions, Victim-1 did not shoot back "double or maybe even four times." *See* GX 301-A; GX 301-C; GX 302. Following the shooting, law enforcement recovered and examined Victim-1's CBP-issued firearm, the magazine contained within that firearm, and an extra magazine Victim-1 had in his pocket. *See* GX 302. Victim-1's CBP-issued firearm contained a magazine which has a 15 round capacity and, when it was recovered following the shooting, there were 14 rounds in the magazine. *See* GX 302. Meaning, Victim-1 could only have fired twice: the round that was chambered in the gun, and one round from the magazine. The additional magazine

recovered that Victim-1 had with him that night, which also has a 15 round capacity, was recovered with all 15 rounds. *Id.*

### 3. Mora Nunez's Fingerprints Were Found on the Ammunition Tray Inside of Aybar-Berroa's Residence

To prove that Mora Nunez's fingerprints were found on the ammunition tray recovered from Aybar-Berroa's residence, the Government intends to offer the NYPD report detailing the recovery of the ammunition at Aybar-Berroa's residence (GX 305), and the NYPD Latent Print Section report showing that Mora Nunez's fingerprint was found to be on the ammunition tray (GX 303).

As detailed in the PSRs, and as the Government expects this evidence to establish, on or about August 12, 2025, the NYPD received a call from the Fortune Society Freedom House (the "Fortune Society" or "Shelter"), a transitional housing unit for adult men, informing law enforcement officers that Shelter staff were clearing out defendant Aybar-Berroa's belongings from his bedroom and found a firearm and ammunition in his bedroom locker.[9] MN-PSR ¶ 26; AB-PSR ¶ 26. Pursuant to a state court issued search warrant, NYPD detectives searched Aybar-Berroa's shelter bedroom. *Id.* In Aybar-Berroa's bedroom, the detectives recovered a BB-gun, a box of .380 Sig Sauer ammunition containing six live cartridges, and two loose .380 Sig Sauer cartridges. *Id.* The .380 caliber Sig Sauer ammunition recovered from Aybar-Berroa's bedroom is the same ammunition used by defendant Mora Nunez in the July 19, 2025 shooting of Victim-1. Moreover, after subsequent forensic testing, Mora Nunez's fingerprint was found on the .380 Sig Sauer ammunition tray, which was located inside of the Sig Sauer ammunition box, found inside of Aybar-Berroa's bedroom closet. *Id.*; *see* GX 303.

### 4. Mora Nunez Made Threatening Statements to the DHO

To establish that Mora Nunez made a threatening statement to a DHO during a proceeding at the MDC, the Government intends to introduce the report generated regarding the incident (GX 401).

As set forth in MN-PSR ¶ 27, that report will show that, on January 22, 2026, during a disciplinary hearing at the MDC, Mora Nunez made the following statements in Spanish, which were heard by an MDC employee who was acting as Mora Nunez's interpreter during the hearing: "You don't know who I am in the streets. The DHO lady is going to find out the hard way. I am going to send people to get her and the officer who wrote me up. Look me up I'm the guy who killed the federal officer in uptown Manhattan." Mora Nunez was given a disciplinary infraction for these statements.

The Government believes that the Court can and should consider this conduct under § 3553(a) in connection with sentencing.

---

[9] Defendant Aybar-Berroa had been in federal custody since his July 21, 2025 arrest by law enforcement officers.

## III. The Evidence Establishes, by a Preponderance, that Attempted Murder in the First Degree is the Appropriate Cross-Reference

The shooting of Victim-1 by Mora Nunez constituted attempted first-degree murder, as it was committed with premeditation and intent to kill. Accordingly, this Court should apply the attempted first-degree murder cross-reference in calculating the defendants' applicable Guidelines ranges.

### A. The Section 2K2.1(c) Cross-Reference

Section 2K2.1 of the Guidelines applies to a conviction for unlawful possession of ammunition. The cross-reference provision in Section 2K2.1(c)(1) provides that where, as here, a defendant used or possessed ammunition "in connection with the commission or attempted commission of another offense," Section 2X1.1 should be applied "in respect to that other offense, if the resulting offense level is greater than that determined" under Section 2K2.1. U.S.S.G. § 2K2.1(c)(1)(A). In turn, Section 2X1.1 provides that, "[w]hen an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section, apply that guideline section." U.S.S.G. § 2X1.1(c)(1).

Section 2A2.1 of the Guidelines applies to the offense assault with intent to commit murder or attempted murder. U.S.S.G. § 2A2.1. Under this section, the base offense level is 33 "if the object of the offense would have constituted first degree murder; or 27, otherwise." U.S.S.G. § 2A2.1(a)(1) and (a)(2). The Guidelines define "first degree murder" as "conduct that . . . would constitute first degree murder under 18 U.S.C. § 1111," the federal murder statute. U.S.S.G. § 2A2.1, Application Note 1.

Pursuant to the Guidelines, a defendant convicted of aiding and abetting under 18 U.S.C. § 2 is punishable as a principal. *See* 18 U.S.C. § 2; *see also* U.S.S.G. § 2X2.1.

### B. Attempted Murder Under Section 1111

The federal murder statute defines murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111. A murder that is either premeditated or committed by certain means or in the course of certain felonies is murder in the first degree. *Id.* The difference between aggravated assault and attempted first degree murder is one of intent. First degree murder requires that a defendant acted with "a specific intent to kill," but aggravated assault requires only that the defendant acted "with intent to cause bodily injury." *See United States v. James*, 2024 WL 4456205, at *1-2 (2d Cir. Oct. 10, 2024). Any other murder is defined as second-degree murder. 18 U.S.C. § 1111.

To prove attempted murder, the Government must prove specific intent to kill. *Braxton v. United States*, 500 U.S. 344, 351 n.* (1991); *United States v. Stroman*, 420 F. App'x 100, 105 (2d Cir. 2011) ("*Stroman I*") (quoting *Braxton*, 500 U.S. at 351 n.*); *see also United States v. Morgan*, No. 22-2798, 2024 WL 747904, at *3 (2d Cir. Feb. 23, 2024) (explaining that the district court did not err in finding premeditation and specific intent to kill as required to warrant the attempted first-

degree murder sentencing enhancement); *United States v. Stroman*, 498 F. App'x 67, 69 (2d Cir. 2012) (explaining that the district court had to conclude, by a preponderance of the evidence, that the defendant shot his gun with the intent to kill at least one of the victims (first citing *Braxton*, 500 U.S. at 351 n.*; and then citing *Stroman I*, 420 F. App'x at 105)); *see also Braxton*, 500 U.S. at 351 n.* ("[A]ttempt to commit murder requires a specific intent to kill." (citation omitted)).

"[I]t is well-settled that, as a general matter, criminal intent may be proven by circumstantial evidence," and that a factfinder may infer "that a person intends the ordinary consequences of his voluntary acts." *United States v. Nelson*, 277 F.3d 164, 197 (2d Cir. 2002); *see also United States v. Delgado*, 972 F.3d 63, 74 (2d Cir. 2020). Courts consider numerous factors as relevant to specific intent to kill, including: whether the defendant fired at close range (*i.e.*, "up to 15 to 20 feet" *United States v. Belmar*, No. 21 Cr. 16 (KMW), 2024 WL 2798860, at *4 (S.D.N.Y. May 31, 2024)); whether the defendant fired repeatedly; whether the defendant pursued the victim before firing or chased the victim after firing; whether the defendant brandished the gun first. *See, e.g.*, *United States v. Passley*, No. 22-1361, 2023 WL 8921150, at *2 (2d Cir. Dec. 27, 2023) (affirming a sentencing enhancement for first-degree attempted murder where the defendant, *inter alia*, "pulled up next to the victims' van, took out a handgun, and fired into the side of the van" and also finding that specific intent does not require the firing of multiple shots at an intended victim); *United States v. Rodriguez*, 738 F. App'x 729, 730 (2d Cir. 2018) (finding that video surveillance footage established the defendant acted with the "specific intent to kill the vehicle's occupant or occupants" "by bringing a firearm to the scene, waiting for a specific vehicle to approach from down the street, concealing his presence before firing four shots into the vehicle at close range"); *United States v. Greer*, 57 F.4th 626, 629 (8th Cir. 2023) ("Ample case law shows that shooting at a particular person, or a group of people, demonstrates a specific intent to kill."); *United States v. Bradford*, 822 F. App'x 335, 339 (6th Cir. 2020) (explaining that the court had "previously found that specific intent to kill could be inferred from a defendant firing a gun aimed at an individual"); *People v. Harper*, 17 N.Y.S.3d 797, 800 (App. Div. 2015) (finding that the defendant's intent to kill "was readily inferable from his conduct" based on the evidence because "there were multiple shots fired at the victim").

What sets first-degree murder apart from second-degree murder are "premeditation" and "deliberation". *United States v. Mulder*, 273 F. 3d 91, 117 (2d Cir. 2001); *see also United States v. Cespedes*, 2015 WL 4597539, at *3 (S.D.N.Y. July 30, 2015) (citing *United States v. Begay*, 673 F. 3d. 1038, 1042 (9th Cir. 2011)). "Premeditation requires 'a cool mind' ... capable of reflection and "some appreciable time for reflection and consideration before execution of the act." *Cespedes*, 2015 WL 4597539, at *3 (internal quotation marks and citation omitted); *see also Delaney*, 717 F.3d at 556 ("[P]remeditation requires that 'an appreciable time elapse between formation of the design and the fatal act within which there is, in fact, deliberation.'" (emphasis omitted) (quoting *Fisher v. United States*, 328 U.S. 463, 469 n.3 (1946)). That period of time need not be days, hours, or even minutes, however. Rather, "it is the fact of deliberation, of second thought[,] that is important." *Cespedes*, 2015 WL 4597539, at *3 (quoting *United States v. Catalan–Roman,* 585 F.3d 453, 474 (1st Cir.2009) (citation omitted) (alteration in original)). "[A] brief moment of thought may be sufficient to form a fixed, deliberate design to kill." *United States v. Stevens*, No. 24-1217, 2025 WL 651456, at *2 (3d Cir. Feb. 28, 2025), *cert. denied,* 146 S. Ct. 197, 223 L. Ed. 2d 72 (2025) (quoting *Gov't of the V.I. v. Lake*, 362 F.2d 770, 776 (3d Cir. 1966).

Like specific intent to kill, premeditation may be inferred from circumstantial evidence. *Mulder*, 273 F.3d at 117; *see also Cespedes*, 2015 WL 4597539, at *3.

### C. The Defendants Committed Premeditated Attempted First-Degree Murder

First, Mora Nunez acted with intent to kill and premeditation, and Aybar-Berroa aided and abetted the same. With respect to intent to kill, just a few minutes after the defendants robbed the Female Victim of her cellphone, while apparently identifying additional targets for their robbery spree, the defendants observed the Victims sitting by the Hudson River. GX 101 at 00:01-00:13. Notably, unlike when he approached the Female Victim, Mora Nunez, was already brandishing his gun when he approached the Victims, and he then pointed the gun at Victim-1's head at nearly point-blank range. *See* GX 101 at 00:23-00:24. Despite Victim-1's attempt to move away, and while separated by only a few feet, Mora Nunez fired at Victim-1's head twice, striking Victim-1 in the face and arm. *Id.* Mora Nunez then attempted to fire again, but the gun appears to have jammed and ejected a live round (*i.e.*, the live .380 Sig Sauer cartridge found at the scene (*see* GX 301-B)). Because Mora Nunez fired his gun multiple times at Victim-1's head from close range, the defendants cannot reasonably dispute that Mora Nunez—and, by extension, Aybar-Berroa—intended to kill Victim-1. *See United States v. McBride*, 2023 WL 4282298, at *2 (2d Cir. June 30, 2023) (applying first degree murder cross-reference where the defendant shot the victim at close range following an altercation); *see United States v. Muyet*, 994 F. Supp. 501, 518 (S.D.N.Y. 1998) (collecting cases that repeated firing of a gun at a victim at close range evidences an intent to kill).

Second, the shooting in this case was premeditated. Had Mora Nunez not planned to use the gun on Victim-1, he could have approached the Victims with the gun still in his pants—as he did when robbing the Female Victim of her cellphone. Instead, Mora Nunez approached Victim-1 with the firearm pointed at Victim-1's head and, unlike the Female Victim, Victim-1 did not have any expensive possessions, such as jewelry or a cellphone, clearly visible on himself. Moreover, based on the video, it is clear when Victim-1 attempted to move away from Mora Nunez, Mora Nunez fired twice. GX 101 at 00:22. Mora Nunez had the opportunity to turn and run back to Aybar-Berroa and flee on the motorbike. Mora Nunez had the opportunity to end the encounter without shooting his gun at Victim-1. Mora Nunez certainly had the opportunity to stop shooting after his first shot had already hit Victim-1 in the face. Shooting at Victim-1 multiple times, despite having an opportunity to flee, clearly shows a preexisting intent to shoot one of the Victims.

Moreover, the evidence seized from the defendants' cellphones establishes that on July 14 and 15, 2025, *i.e.*, four to five days before the shooting, the defendants had a firearm in their possession that appears to be similar with the one used in the shooting. MN-PSR ¶ 25; AB-PSR ¶ 25; GX 501; GX 502. Similarly, the evidence establishes that Mora Nunez and Aybar-Berroa possessed .380 Sig Sauer ammunition—the ammunition used in the shooting—prior to the shooting because the ammunition was found in Aybar-Berroa's residence's closet, and Mora Nunez's fingerprint was found on the ammunition tray. GX 303; MN-PSR ¶ 26; AB-PSR ¶ 26. This evidence plainly demonstrates that the defendants planned to use a loaded firearm.

In sum, Mora Nunez approached the Victims with a raised, loaded firearm; and then opened fire on Victim-1, shooting him twice, in the face and arm, from nearly point-blank range. That demonstrates both a specific intent to kill and premeditation. And lest there be any doubt of Mora

Nunez's intention, he later described himself to an MDC employee as, "the guy who killed the federal officer in uptown Manhattan." Fortunately, he did not succeed, but it was not for lack of intent.

### D. The Attempted Murder in the First Degree Cross Reference Applies to Aybar-Berroa

Aybar-Berroa claims in his brief that the cross reference does not apply to him because he lacked the requisite mental state. This argument ignores both the plain text of the cross reference and Aybar-Berroa's plea. U.S.S.G. 2K2.1 applies where:

> the defendant used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or ammunition cited in the offense of conviction with knowledge or intent that it would be used or possessed in connection with another offense

U.S.S.G. § 2K2.1(c)(1)(A).

Here, Aybar-Berroa possessed the ammunition cited in the offense of conviction "in connection with the commission or attempted commission of" the shooting. U.S.S.G. 2K2.1(c)(1); PSR ¶ 2. Aybar-Berroa pleaded guilty to aiding and abetting Mora Nunez's possession of the precise ammunition used in the shooting. *See United States v. Taylor*, 160 F.4th 874, 883-84 (7th Cir. 2025) (holding that defendant possessed firearm used in the uncharged shooting under aiding and abetting theory of liability, satisfying possession requirement for applying homicide cross-reference). And, he did so directly in connection with Mora Nunez's attempted murder of Victim-1: Aybar-Berroa drove Mora-Nunez to where the shooting occurred, sat nearby as a getaway driver (from where he could see and knew that the shooting had taken place), and then fled with Mora Nunez on the motorbike once the shooting had occurred. Thus, the attempted murder cross reference in § 2K2.1(c)(1)(A) governs the Guidelines calculation for both Mora Nunez and Aybar-Berroa. No more is required.

Nevertheless, Abyar-Berroa claims that this provision of § 2K2.1(c)(1)(A)—which he refers to as the first clause of the cross-reference—does not apply to Aybar-Berroa. Dkt. 64 at 17-21. Instead, he claims that where a defendant possesses ammunition in connection with "an offense committed by *another individual*," as Aybar-Berroa did, the second clause applies. *Id.* That clause requires that the defendant possess or transfer ammunition "cited in the offense of conviction with *knowledge or intent* that it would be used or possessed in connection with another offense." § 2K2.1(c)(1)(A) (emphasis added). But, this reading of the cross-reference requires the Court to read language into the Guidelines that is not there. Instead, the more natural reading of the two clauses in § 2K2.1(c)(1)(A) is that the first clause applies where the defendant, as here, possessed (either through direct or aiding and abetting liability) the ammunition or firearm "in connection with" another offense and the second clause applies where the defendant possessed the ammunition

or firearm at a time separate from and before the other offense. The Court should therefore reject Aybar Berroa's argument that the cross reference does not apply to him.[10]

## IV. Conclusion

Based on the foregoing, the Court should adopt the factual findings in the PSRs and apply the attempted first-degree murder cross-reference, pursuant to U.S.S.G. § 2A2.1(a)(1).

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: Mostafa Khairy
Mostafa Khairy
Special Assistant United States Attorney
Tel.: (212) 637-2406

cc: Neil P. Kelly, Esq. (by ECF)
Jarrod Schaeffer, Esq. (by ECF)

[10] The Court should also reject the defendants' claim that application of the attempted first-degree murder guideline would violate the Fifth and Sixth Amendments. As the defendants themselves acknowledge, *see* Dkt. 64 at 22; Dkt. 66 at 20, this argument is foreclosed by Circuit precedent. *See, e.g.*, *United States v. Martinez*, 525 F.3d 211, 215 (2d Cir. 2008).