**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 30, 2026

**BY ECF**
The Honorable Loretta A. Preska
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: *United States v. Miguel Francisco Mora Nunez*, S1 25 Cr. 367-1 (LAP)**

Dear Judge Preska:

The Government respectfully submits this letter in advance of the sentencing of defendant Miguel Mora Nunez, scheduled for October 5, 2026. On July 19, 2025, Mora Nunez, along with his co-defendant, Christhian Aybar-Berroa, attempted to murder an off-duty Customs and Border Protection ("CBP") officer, Officer Joshua Sinclair, in the course of a robbery in Fort Washington Park, when Mora Nunez pointed a gun at Officer Sinclair's head and pulled the trigger twice, leaving Officer Sinclair with permanent injuries, before the defendant and Aybar-Berroa fled the scene on a motorbike driven by Aybar-Berroa. This egregious shooting has left Officer Sinclair with permanent injuries to his face and hand. For the reasons set forth below, the Government respectfully submits that a sentence of 180 months' imprisonment, which is the statutory maximum available sentence and within the applicable United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines") range, is appropriate in this case.

## I. Offense Conduct[1]

Mora Nunez is a native and citizen of the Dominican Republic who illegally entered the United States from Mexico in April 2023 through the San Luis, Arizona, border. (PSR ¶¶ 28-30).[2] After being caught at the border and temporarily detained by CBP, the defendant was issued a Notice to Appear ("NTA"), placing him in immigration removal proceedings. (PSR ¶¶ 31-32). The defendant failed to appear at his immigration proceedings as directed and, as a result, was ordered removed from the United States by an immigration judge. (PSR ¶¶ 32-34).

---

[1] This section refers to certain evidence received by the Court in connection with the Fatico hearing held on September 28, 2026 (the "Hearing"). "GX" refers to the exhibits introduced into evidence at the Hearing and received by the Court in connection with the Government's September 23, 2026 pre-hearing brief. *See* Dkt. 68.

[2] "PSR" refers to the final Presentence Investigation Report, dated July 31, 2026, prepared by the United States Probation Office (or "Probation").

On July 19, 2025, the defendant and Aybar-Berroa were riding a motorbike inside of Fort Washington Park in Manhattan, New York. (PSR ¶ 10). Aybar-Berroa was driving the motorbike and Mora Nunez was riding as a passenger seated behind Aybar-Berroa. (*Id.*). At approximately 11:45 p.m., Mora Nunez forcibly robbed Mrs. Marjola Sopi[3] in Fort Washington Park of her cellphone. (*Id.*; *see also* GX 201). After robbing Mrs. Sopi of her cellphone, the defendants fled on the motorbike. (*Id.*).

Approximately a few minutes later, about 100 yards from where the defendants robbed Mrs. Sopi of her cellphone, and while still inside Fort Washington Park, the defendants identified their next targets: Officer Joshua Sinclair and Ms. Cynthia Cheung, who were sitting on rocks by the Hudson River talking.[4] (PSR ¶ 11). Aybar-Berroa turned the motorbike around while Mora Nunez got off the motorbike and approached Officer Sinclair and Ms. Cheung while brandishing a firearm. (PSR ¶¶ 13-14). What the defendants did not know at the time was that Officer Sinclair was an off-duty CBP officer and carrying his CBP-issued firearm, a 9mm Glock-19. As Officer Sinclair testified at the Hearing, he heard footsteps behind him and when he turned around, Mora Nunez was pointing a firearm with an extended magazine at his head, from less than two feet away. (PSR ¶¶ 13-14; GX 101; Tr. at 14:15-15:10).[5] Upon seeing the extended magazine, Officer Sinclair slid down the rock he was sitting on, spun around while also lifting up his shirt to draw his firearm. (*Id.*). However, as Officer Sinclair spun around, Mora Nunez fired his gun twice, with one bullet striking Officer Sinclair in his arm and face. (*Id.*)



[3] Mrs. Sopi is identified in the PSR as the "Female Victim."

[4] Officer Sinclair is identified in the PSR as "Victim-1," while Cheung is identified as "Victim-2."

[5] "Tr." refers to the transcript from the Hearing. A copy of the Transcript is annexed hereto as Exhibit C.

Although suffering a gunshot wound to the arm and face, Officer Sinclair was able to return fire, shooting twice, hitting Mora Nunez in the lower body. (PSR ¶ 14; GX 101; Tr. at 17:6-17:15). After being shot, Mora Nunez ran back towards the motorbike while holding his leg and groin area, and fled on the back of the motorbike driven by Aybar-Berroa. (PSR ¶ 15).

Approximately 20 minutes after the shooting, Aybar-Berroa dropped off Mora Nunez at BronxCare Hospital's emergency room. (PSR ¶ 17). While at the hospital, Mora Nunez was identified as the shooter and subsequently arrested by members of the New York City Police Department ("NYPD"). (PSR ¶¶ 17-22). After fleeing the hospital, Aybar-Berroa contacted a family member of Mora Nunez ("Individual-1") and informed Individual-1 of the shooting. (PSR ¶ 23). At some point on July 20, 2025, Aybar-Berroa and Individual-1 met, wherein Aybar-Berroa provided Individual-1 with the clothes he was wearing during the shooting, and Individual-1 provided Aybar-Berroa with clothing belonging to Mora Nunez to change into. (PSR ¶ 24). Aybar-Berroa was arrested on July 21, 2025, by law enforcement officers on an immigration warrant. (PSR ¶ 40).

Immediately following the shooting, NYPD canvassed the area where the shooting took place and recovered one live .380 Sig Sauer cartridge and one spent .380 PMC casing (the "Ammunition"). (PSR ¶ 16). The Ammunition are both .380 caliber cartridges and could not have been fired from Officer Sinclair's service weapon, since Officer Sinclair's Glock-19 uses 9mm ammunition. (*Id.*).

Following the shooting, law enforcement officers obtained search warrants for Mora Nunez and Aybar-Berroa's cellphones. (PSR ¶ 25). On Mora Nunez's cellphone was a photograph of himself and Aybar-Berroa posing with a firearm, which was taken approximately four to five days prior to the July 19, 2025 shooting, and posted on their respective social media accounts. (PSR ¶ 25; *see* GX 501). On Aybar-Berroa's cellphone was a video of himself posing with a firearm, ejecting the magazine showing that it was loaded, putting the magazine back in, and pantomiming firing the gun at the camera. (PSR ¶ 25; *see* GX 502).





On or about August 12, 2025, the NYPD was contacted by the director of a transitional housing facility where Aybar-Berroa resided prior to the shooting. (PSR ¶ 26). The facility director stated that shelter staff were clearing out Aybar-Berroa's belongings and had found a firearm in his bedroom locker. (*Id.*). The NYPD sought and obtained a search warrant for Aybar-Berroa's room at the housing facility, wherein they found a BB-gun, a box of .380 Sig Saur ammunition containing six live Sig Sauer cartridges, and two loose .380 Sig Sauer cartridges. (*Id.*). Mora Nunez's fingerprint was found on the ammunition tray which contained the ammunition found in Aybar-Berroa's closet. (*Id.*).

On January 22, 2026, during a disciplinary hearing at the Metropolitan Detention Center ("MDC") in Brooklyn, New York, Mora Nunez made the following statements in Spanish and heard by an MDC employee who was acting as Mora Nunez's interpreter: "You don't know who I am in the streets. The DHO lady is going to find out the hard way. I am going to send people to get her and the officer who wrote me up. Look me up I'm the guy who killed the federal officer in uptown Manhattan." Mora Nunez was given an infraction for these threats against the MDC employee. (PSR ¶¶ 6, 27).

## II. Criminal History[6]

Although the defendant does not have any prior convictions, this was not his first arrest or contact with law enforcement. (PSR ¶¶ 67-72). Mora Nunez was previously arrested in 2024 for a robbery where he purportedly robbed an individual and then stated, "don't look me or I'll shoot you." (PSR ¶ 72). This case was ultimately dismissed. (*Id.*). Also in 2024, Mora Nunez was arrested for Criminal Contempt in the Second Degree for violating an order of protection. (PSR ¶ 71). This case resulted in an adjournment in contemplation of dismissal (or "ACD"). (*Id.*).

[6] Mora Nunez and Aybar-Berroa were indicted by the New York County District Attorney's Office for the instant offense, and that case is currently pending. (PSR ¶¶ 68-69).

Most significantly, Mora Nunez has an active arrest warrant related to an armed robbery he and another individual committed in Leominster, Massachusetts. (PSR ¶ 67). According to the incident report, and surveillance video the Government has viewed, Mora Nunez entered the jewelry store, jumped over the counter, pulled a firearm, and pointed it at the store's employee. (*Id.*). Mora Nunez then used duct tape to bind the victim's wrists, ankles, and mouth, before robbing the employee and the store. (*Id.*). In addition, two firearms were stolen from the store by Mora Nunez and the other suspect. (*Id.*).[7]

## III. Procedural History and Applicable Guidelines Range

### A. The Charges and Plea

On August 13, 2025, a grand jury in this District returned a two-count indictment (the "Indictment") charging Mora Nunez with one count of possession of ammunition by an illegal alien, in violation of 18 U.S.C. § 922(g)(5), and Aybar-Berroa with one count of accessory after the fact to possession of ammunition by an illegal alien, in violation of 18 U.S.C. § 3. (*See* Dkt. 13). On November 13, 2025, a grand jury in this District returned a three-count indictment (the "S1 Indictment") against the defendants which contained the same two counts as the Indictment, but with an additional charge against Aybar-Berroa for possession of ammunition by an illegal alien, in violation of 18 U.S.C. § 922(g)(5). (*Id.* at 24). On May 4, 2026, Mora Nunez pled guilty to possession of ammunition by an illegal alien, in violation of 18 U.S.C. § 922(g)(5), which was Count One of the S1 Indictment. (PSR ¶¶ 1-2).

### B. The Fatico Hearing and the Guidelines Range

Following the issuance of the PSR by Probation, Mora Nunez lodged nearly 20 factual objections to the PSR. (*See* PSR at 26-31).[8] On September 28, 2026, the Court held a *Fatico* hearing wherein the Government submitted: the video recorded interviews of Mrs. Sopi and Ms. Cheung; various NYPD reports and forensic lab reports; the defendant's MDC report related to the threat made against the MDC employee; and evidence obtained from the defendants' cellphones pursuant to a search warrant. (*See* Min. Entry dated September 28, 2026). Officer Sinclair testified at the Hearing and recounted the horrific events of the shooting, including, among other things, that Officer Sinclair "heard the blood running from my face and it was running like a bottle of water being poured onto the rocks" (Tr. at 18:20-18:23), he likely would have died if not for NYPD Officer Trocchia driving him to the hospital (*Id.* at 24:9-24:22); and the several surgeries he went through during his 12 day stay in the hospital (*Id.* at 25:7-25:12).

---

[7] Mora Nunez has not yet been arrested related to this robbery. According to the Worcester County District Attorney's Office, Mora Nunez faces extradition to Massachusetts following the conclusion of this federal case.

[8] The defendant's objections are set forth in the PSR and summarized in the Government's pre-hearing brief. (*See* Dkt. 68 at 2).

Following the conclusion of the Hearing, the Court issued an oral decision finding, among other things, that the defendant:

- Forcibly robbed Mrs. Sopi on July 19, 2025 (Tr. at 83:24);
- Approached Officer Sinclair and Ms. Cheung brandishing a firearm (*Id.* at 84:25);
- Pointed his gun at Officer Sinclair's head from less than two feet away or from point blank range (*Id.* at 84:2);
- Fired his gun at Officer Sinclair first (*Id.* at 81:20); and
- Fired his gun twice at Officer Sinclair (*Id.* at 84:9-84:13).

After making these factual findings, the Court further found that the defendant's shooting of Officer Sinclair was intentional and premeditated, and, consequently, the first-degree attempted murder cross-reference, pursuant to U.S.S.G. § 2A2.1(a)(1), applied. (Tr. at 84:16-88:1).

As a result, the defendant's base offense level is 33, and since Officer Sinclair sustained permanent or life-threatening bodily injury, a four-level increase would apply, for a total offense level of 37. In the event the Court determines that the defendant adequately accepted responsibility and reduces the offense level by three, for an adjusted offense level of 34, with a Criminal History Category I, the defendant's Guidelines would be 151 to 188 months' imprisonment (which is capped at 180 months' imprisonment pursuant to 18 U.S.C. § 924(a)(8)).

## IV. Discussion

### A. Applicable Law

Since *United States v. Booker*, the Guidelines are advisory, providing sentencing courts with a recommendation. 543 U.S. 220 (2005). *Booker* held that although the Guidelines are not mandatory, courts must "consult" them during sentencing. *Id.* at 264. The Guidelines provide "the starting point and initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). Thereafter, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) relevant policy statements by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *Gall*, 552 U.S. at 50 & n.6.

The statute directs judges to impose sentences sufficient to "comply with the purposes of sentencing." This analysis requires the consideration of the following sentencing goals:

(A) To reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense;
(B) To afford adequate deterrence to criminal conduct;
(C) To protect the public from further crimes of the defendant; and
(D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

A sentencing court may consider "any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed." *Wasman v. United States*, 468 U.S. 559, 563-64 (1984); *accord Pepper v. United States*, 562 U.S. 476, 488 (2011). "Highly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Williams v. New York*¸ 337 U.S. 241, 247 (1949).

**B. A Sentence of 180 Months' Imprisonment is Appropriate in This Case**

In this case, the nature and circumstances of the offense, the need to promote respect for the law, provide just punishment, protect the public, and deter future criminal conduct, warrant a within-Guidelines sentence of the statutory maximum of 180 months' imprisonment.

*First*, the seriousness of the defendant's conduct warrants a substantial term of imprisonment. The offense in this case was horrific. The crime of conviction is alien in possession of ammunition. That, standing alone and without more, is dangerous conduct. The facts and circumstances of that possession underscore and animate the seriousness of the crime here. The defendant and his co-defendant, Aybar-Berroa, were riding around on a motorbike robbing—or attempting to rob—random victims. The defendant forcibly robbed a woman of her cellphone, then continued their attempted robbery spree in Fort Washington Park. Unfortunately, both for the defendants and Officer Sinclair, their next attempt nearly turned deadly.

Moments after robbing Mrs. Sopi, the defendant dismounted the motorbike and approached Officer Sinclair and Ms. Cheung—with his gun raised and pointed at Officer Sinclair's head—while both had their backs to him, facing the water. Upon realizing that Officer Sinclair was armed, the defendant did not retreat or attempt to flee; rather, he pointed his weapon at Officer Sinclair's head and fired two shots from point-blank range, hitting Officer Sinclair in the face and arm, and nearly killing him. He also endangered Ms. Cheung, who was thankfully able to duck behind rocks just before the shooting began. The defendant, who had been shot by the Officer Sinclair's return fire, then fled, jumping back onto the motorbike on which Aybar-Berroa sped away.

Officer Sinclair described this attack in detail at the Hearing:

> Q.: While you were turning around, did the individual fire his gun at you?
>
> A.: Yes.
>
> Q.: How do you know?

A.: So, first of all, I heard it, and also, I felt the impact. Although, you know, I didn't feel any pain with it, but I felt the impact in my face.

Q.: Describe what you heard.

A.: It was like crackling sounds.

Q.: And this impact, where did you feel it?

A.: In my face.

Tr. at 17:8-17:18. Officer Sinclair further testified at the Hearing that as the defendants fled the scene, he could hear the blood "running from my face and it was running like a bottle of water being poured onto the rocks" and he made the decision to try to save his own life by putting pressure on the wound rather than pursue the defendants. (Tr. at 18:20-18:23). As mentioned by Officer Sinclair at the hearing, if not for heroic actions of NYPD Officer Trocchia—quickly and decisively determining to put Officer Sinclair in an NYPD vehicle and drive him to the hospital rather than wait for an ambulance—Officer Sinclair likely would have bled out at the security booth on that night. (Tr. at 24:9-24:22). Moreover, the only reason we are not sitting here today under far more grave circumstances is pure luck: the defendant's gun jammed while shooting at Officer Sinclair. But it was not for lack of trying. As the Court found, Tr. at 84:13, Mora Nunez attempted to shoot his gun a second time, but instead of firing a bullet, a live cartridge ejected and fell to the floor. Officer Sinclair is lucky to be alive.

Due to his injuries, Officer Sinclair spent 12 days in the hospital following the shooting and required several surgeries to his face and arm. (Tr. at 24:23). As the Court heard from Officer Sinclair, the road the recovery is far from over. (*See* PSR ¶¶ 43-47). Despite this incident occurring over 14 months ago, Officer Sinclair still requires several more surgeries to his face and mouth. ((*Id.*; *see also* Tr. at 25:19)). Nor is Officer Sinclair able to return to work, due to lack of mobility of his thumb, and he may be forced to retire on disability. (PSR ¶ 46). Thus, the defendants' actions that night have also impacted Officer Sinclair financially. Such a heinous crime calls for a substantial punishment.

*Second*, the defendant has demonstrated a serious lack of respect for the law, which requires just punishment. The defendant, who was in the United States unlawfully, flaunted a gun on social media, then used one just a few days later. The defendant and his co-defendant rode around Fort Washington Park, armed with a gun, attempting to rob victims. When confronted with an unexpectedly armed victim, Officer Sinclair, the defendant tried to kill him. In short, the defendant committed an attempted murder, preceded by multiple armed robberies, while in the United States unlawfully and while *separate* robbery charges were pending in Massachusetts. The defendant has exhibited a total disrespect for the law, which demands a significant sanction.

The defendant then ratified his violent, unlawful conduct while imprisoned at the MDC, furthering underscoring his lack of respect for the law. Indeed, while threatening another federal officer (the MDC disciplinary hearing officer), the defendant bragged, "[l]ook me up I'm the guy who killed the federal officer in uptown Manhattan"—lending credence that he intended to make

good on his threat to the MDC employee. The defendant has also received several infractions while in custody at MDC ranging from fighting with other inmates, interfering with security devices, threatening MDC staff, destroying equipment, and refusing to obey orders by MDC staff. (PSR ¶ 6). Nothing about the defendant's behavior since his pretrial detention in July 2025 to the upcoming sentencing provides any confidence that the defendant respects the law. His sentence should reflect that reality.

*Third*, a substantial term of imprisonment is necessary to afford general deterrence. In a 2022 report, the United States Sentencing Commission conducted empirical research on the relationship between the length of incarceration and recidivism in the federal offender population.[9] The Commission studied 32,135 federal criminal defendants released in 2010 and divided those defendants into groups based on the lengths of their sentences. In the following eight years, the Commission noted when released defendants committed new crimes. According to the report, firearms offenders recidivated at a higher rate than all other offenders, and 69% of firearms offenders were rearrested for a new crime during the eight-year follow up period of the study, as opposed to 45.1% for all other offenders. Individuals who commit serious and violent crimes using firearms must understand that such conduct will not be tolerated, and that it will be met with serious consequences. Imposing a substantial term of imprisonment in this case is necessary to deter the defendant from committing additional crimes.

Moreover, a significant sentence is necessary to afford some measure of deterrence to individuals who illegally enter the United States and then commit crimes. The defendant is not someone who illegally entered the United States and sought a better future by becoming a productive member of society. The defendant unlawfully came to the United States and then proceeded to engage in crime. A Guidelines sentence is thus necessary to demonstrate to the defendant that he cannot continue to disregard the criminal and immigration laws of the United States, to deter him from future criminal conduct, to hold him accountable for his actions, and to promote respect for the rule of law. *See, e.g.*, *United States v. Sepulveda*, 850 F. App'x 98, 101 (2d Cir. 2021) (affirming above-Guidelines sentence as substantively reasonable where district court explained that such a sentence was warranted in light of, among other factors, the defendant's "long history of criminal conduct and the failure of his prior, shorter sentences and deportation to deter him from committing further crimes").

---

[9] *See* United States Sentencing Commission, Length of Incarceration and Recidivism, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220621_Recidivsm-SentLength.pdf (last accessed September 29, 2026).

## V. Conclusion[10]

For the reasons set forth above, the Government respectfully requests that the Court impose a within-Guidelines sentence of 180 months' imprisonment in this case.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: *Mostafa Khairy*
Mostafa Khairy
Samantha Fry
Assistant United States Attorneys
Tel.: (212) 637-2406 / -2490

cc: Counsel of Record

[10] Officer Sinclair and Ms. Cheung each provided a victim impact statement for the Court's consideration, which are annexed hereto as Exhibits A and B, respectively.